Smith, Appellant, *v.* L. Blumberg's Son, Inc.

Argued November 26, 1956. Before STERN, C. J., JONES, BELL, CHIDSEY, MUSMANNO and ARNOLD, JJ.

*William M. Alper,* with him *Freedman, Landy & Lorry,* for appellant.

*Ralph S. Croskey,* for appellee.

OPINION BY MR. JUSTICE BELL, March 25, 1957:

Plaintiff appeals from an order granting a new trial in a trespass case in which the jury awarded him a verdict of $25,000.

The lower Court in its opinion said:

"The jury's verdict established that plaintiff, a long-shoreman forty-two years of age, was crossing Dela-

ware Avenue from west to east on the morning of December 7, 1953. When Smith reached the island in the center of Delaware Avenue, he looked to his right for north-bound traffic. Seeing none, he started across the street; he was struck by defendant's truck which was south-bound and bucking traffic, that is, the truck was on the east side of the safety island. An issue of fact was raised as to whether or not the south-bound lanes were blocked.

"The evidence was sufficient to support the jury's verdict on the issue of defendant's negligence and plaintiff's contributory negligence.

"We turn to consider the injuries and damages. Plaintiff suffered a broken little finger of the left hand, a broken bone in the right foot. He also complained of back pain, which was subsequently diagnosed as sub-acute lumbrosacral strain. In addition plaintiff was said to be suffering a post-concussion syndrome.

"As a result of the foregoing injuries plaintiff suffered a loss of earnings of about $800 and was given light work such as checking and pointing because he was physically unable to perform the usual arduous duties of a longshoreman. Total medical expenses were $260.00. [Plaintiff's gross income both before and after the accident, as shown by income tax returns, was as follows: 1951, $5,666.93; 1952, $5,478.37; 1953, $5,-542.45; 1954, $4,706.52; 1955, $5,696.67.] . . .

"The record reveals that the verdict is not only grossly excessive, but it raises, in addition, the serious question as to whether or not the interests of justice require a new trial.

"The testimony introduced to establish the injuries and the diagnoses and prognosis left much to be desired. . . .

"The crucial testimony concerns the back injury and a diagnosis of post-concussion syndrome. Dr. Martin A. Blaker testified that he examined plaintiff on three occasions, January 1, 1954, April 29, 1954 and January 6, 1956. Dr. Blaker found some limitation of back motion and prescribed a brace. The limitation of motion was sufficient in Dr. Blaker's opinion to warrant a diagnosis of sub-acute lumbro-sacral strain; he also stated that the pain would continue and interfere with plaintiff's ability to perform his normal duties.

"Dr. Blaker's testimony was seriously weakened; in his direct examination, although he knew plaintiff had been involved in another accident affecting his back, he failed to mention it in making his prognosis. Upon cross-examination, he acknowledged that he had been informed of the second accident, which occurred on February 19, 1954; at that time a 100-pound bag of wheat fell across plaintiff's shoulders and knocked him to the floor of a truck, injuring plaintiff's back. This second injury occurred between the first and second examinations by Dr. Blaker, but Dr. Blaker was not so advised until August, 1954.

"We can only observe that the testimony of Dr. Blaker was less than frank as to the effect of the second injury upon the condition of the plaintiff's back. He was asked the following question: 'Q. You mean to say now you want this jury to believe the entire ill-condition of Lee Smith, whatever it was that was wrong with this man following the second accident, was due to the first accident? A. No sir.'

"Thereafter, on re-direct, Dr. Blaker testified that an injury to the dorsal spine would not affect the lumbrosacral area. He explained the second answer on the ground counsel for defendant did not indicate that the injury was to the dorsal area of the spine, although Dr. Blaker knew which part of the back was affected.

The doctor was obviously fencing with defense counsel and his answers indicate a lack of the candor and frankness to which a court and jury is entitled.

"Dr. Orr testified for defendant that he had examined plaintiff for a workmen's compensation carrier on April 29, 1954. The examination was for injuries sustained [in the second accident] on February 19, 1954. X-rays revealed no deformity or evidence of trauma. On that date there was no evidence of lumbar muscle spasms, but Dr. Orr noted pain on percussion and palpitation over the spinous processes of the 7th, 8th and 9th dorsal vertebrae. On June 9, 1954 plaintiff was again examined by Dr. Orr; and at that time Smith complained of pain over the tips of the lumbar transverse processes on the left side upon palpitation.

"Dr. Fisher testified that he had examined plaintiff on December 29, 1955; on the basis of a history of recurrent dull right temporal headaches over a period of two years, and the fact that plaintiff was unconscious for some time [5-10 minutes] after the accident, he diagnosed plaintiff's condition a post-concussion syndrome. An electroencephalogram was normal and he referred plaintiff to a neurologist, Dr. Yaskin.

"Dr. Fisher stated that he is an internist [who had been practicing for two years] and that his conclusion of post-concussion syndrome was based solely on the symptoms reported by the plaintiff. He added that he had recommended a spinal puncture, but it was not performed. . . .

. . .

". . . Where the record reveals a tenuous and strained connection between the trauma of the accident and the injuries claimed, and where the record further reveals that plaintiff omitted essential facts in discussing his physical well-being with the doctors, the

accuracy and very foundation of the opinions expressed become open to serious question.

". . . Dr. Blaker carefully refrained from any reference to the second injury to the back; on cross-examination and then on re-direct, his testimony was confusing with reference to the cause and effect of the first accident unrelated to the second; and then his opinion after consideration of the second injury, only adds to the confusion when his testimony is reviewed in its entirety. We cannot state from his testimony that the injury to the back was the result of the first accident only. He testified that he did not want the jury to think that all of plaintiff's difficulty came from the first injury; thereafter he expressed his opinion to the effect that the second injury would not change his opinion that all plaintiff's condition was the result of the first accident.

"It is further significant that plaintiff failed to complain of any head pain or headaches until December, 1955 when he was treated by Dr. Fisher. . . .

"To describe in further detail the medical testimony in this matter would belabor the obvious. The medical testimony fell far short of an effort to ascertain the truth of the matter. The doctors, particularly Drs. Blaker and Fisher, conceded that certain objective tests were available but not utilized. The opinions expressed were not based on any clinical evidence, unless one can term a limitation of motion as such evidence. Dr. Blaker did not even indicate any evidence of muscle spasm or pain until his examination on January 6, 1956.

. . .

". . . Smith did not mention head pain to Dr. Blaker; Smith did not inform Dr. Orr that he had previously injured his back. Obviously, doctors' opinions based on incomplete histories are weakened; if plaintiff

chooses to withhold essential facts he runs the peril of the omissions being exposed. The record indicates a lack of frankness and candor on the part of plaintiff and some of his witnesses.

"Plaintiff's omissions and evasions, intentional or otherwise, cast serious doubt on all of the medical testimony.

". . . Suffice it to say that plaintiff failed to establish with sufficient competent testimony the medical facts to support the verdict rendered.

"Our duty is clear, the case must be retried so that the interests of justice may be served."

A reading of the medical testimony presented on behalf of the plaintiff—even without considering the medical evidence presented by the defendant—raises very serious doubt as to whether it could justify the verdict. When to this bare record is added the lower Court's disbelief in the reliability or credibility of plaintiff and his doctors, it is impossible for us to say that there had been an abuse of discretion in granting a new trial.

In *Edelson v. Ochroch,* 380 Pa. 426, 111 A. 2d 455, the Court said (page 429) : "The rule is well settled that where a trial Judge or Court, who saw and heard the witnesses, grants a new trial, we will not reverse unless there is a clear abuse of discretion or an error of law which necessarily controlled the grant of the new trial or the outcome of the case: Foster v. Waybright, 367 Pa. 615, 80 A. 2d 801; Bellettiere v. Philadelphia, 367 Pa. 638, 81 A. 2d 857; Morse Boulger Destructor Co. v. Arnoni, 376 Pa. 57, 101 A. 2d 705; Harris v. Ruggles Lumber Company, 376 Pa. 252, 101 A. 2d 917." Also *Mozino v. Canuso,* 384 Pa. 220, 223, 120 A. 2d 300.

Order affirmed.

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

The decision of the Majority to send this case back for a new trial represents a waste of time, energy, expense, and an infliction of unnecessary mental travail. To subject litigants to all the worries attendant upon a court trial when justice does not require it constitutes an act of gratuitous supererogation. The Majority does not say that it is shocked by the amount of the verdict rendered in the Court below, it does not say that the Trial Court erred in its charge to the jury, it does not say that the jury misunderstood the charge or the evidence. The Majority Opinion fails to reveal one substantial reason as to why Lee Smith, who at the original trial, was required to relate the harrowing details of how he was run down by a truck, knocked unconscious, and taken to a hospital, must, in narrative, again be struck down, again knocked unconscious and again undergo all the torments of the witness stand and the agony of awaiting a jury's verdict.

No one questions that the defendant, L. Blumberg's Son, Inc., was responsible for the plaintiff's injuries, nor is it claimed that the plaintiff contributed in any way to the happening of the accident. The plaintiff's injuries consisted of a fractured finger, a fractured foot, a serious injury to his lower back, and a post concussion syndrome. In his suit against the owner of the truck, the jury awarded him a verdict of $25,000 which this Court regards as "grossly excessive" but not shocking. We have said repeatedly that "the question of the amount of the verdict would be reviewed only in cases where so grossly excessive as to shock our sense of justice." (*Scott v. American Exp. Co.*, 257 Pa. 25, 31.) The Majority does not say, we repeat, that its sense of justice has been shocked. Are we, therefore, introducing a new standard as to what should constitute an excessive verdict, or is our sense of jus-

tice more easily shocked (where an amount is allegedly excessive) than heretofore? The figure of $25,000, formidable as it is, is awesome only insofar as it is compared to what it is intended to do.

Is $25,000 of shocking magnitude when one considers that it is compensation for the most distressing misfortune which can overtake a longshoreman? Anyone who has the slightest acquaintance with the work of a longshoreman knows that in loading and unloading ships, a disabled back is as crippling as an atrophied arm is to a blacksmith. The work of a longshoreman perhaps represents the maximum of physical exertion, involving, as it does, the all-day-long lifting and carrying of heavy and cumbersome objects, frequently over uncertain footing. The ensemble of effort required by a longshoreman in the discharge of his duties with efficiency and care epitomizes probably the most strenuous muscular exertion to which the human body can be subjected. For a longshoreman to injure his back is to spring a tendon in Atlas's shoulders.

The evidence in this case is uncontradicted that Lee Smith, the plaintiff, has lost 33 1/3% of the use of his back as the result of the injury inflicted by the defendant's truck which hit him with such violence as to send him flying for a distance of ten feet. Dr. Martin A. Blaker testified: "The range of flexion of the back continues to be restricted, and in my last examination it was approximately two-thirds of normal."

Under the testimony presented at the trial, the jury was warranted in concluding the plaintiff has lost one-third of his future earning power. On the basis of an average annual wage of $5500, Lee Smith thus would lose some $1800 per year over a period of 23 years (the difference between his age of 42 and the retirement age of 65). This would mean a total loss of $41,400, which, reduced to present worth, would still leave the

plaintiff a figure in excess of $25,000, especially when one considers the compensation for pain, suffering and inconvenience, plus what he would additionally be entitled to because of normal increases in wages over the years.

The Majority suggests that possibly Smith's disability is due to something other than the truck accident of December 7, 1953, because on February 19, 1954, a 100-pound sack of wheat fell across his shoulders. This accident has received in the Majority Opinion a dramatic setting out of all proportion to the realities of the occurrence. The wheat sack incident was so trifling and the resulting discomfiture so evanescent that the plaintiff lost no time from work on account of it and he made no application for compensation for any injury, nor did he receive any compensation.

It is baffling to me why the Majority seeks to convey the impression that Dr. Blaker was something less than frank in his testimony. The Majority says: "Dr. Blaker did not even indicate any evidence of muscle spasm or pain until his examination on January 6, 1956." As a matter of fact, Dr. Blaker testified that on the very first examination on January 21, 1954, he found plaintiff suffering with a back condition: "I examined his back and found the maximum to which he could bend forward and keep his legs straight—and this motion is called flexion of the lumbosacral spine— he could reach his fingertips about 10 inches from the floor, and that represented some limitation of motion. He could not bend beyond that because of the pain *when I first saw him.* Those are the essential findings at the time of my *first examination*."*

On April 29, 1954, Dr. Blaker examined the plaintiff the second time and he again found "a limitation of motion in the back as *previously* indicated by me."

---

* Italics throughout, mine.

And then, on the last examination, January 6, 1955, Dr. Blaker found: "The back also *continued* to be painful, and he *continues* to wear a back support of the same style as I *originally* ordered."

But more important than this refutation to the Majority's observation is the testimony of the defendant's witness, Dr. T. E. Orr, as to his examination of the plaintiff in June, 1954: "Q. It is the lower back? A. Yes. Q. You found pain on palpation? A. Yes . . . Q. That is an objective sign which you can see yourself? A. You can't see the pain, but *we can see the muscular spasms.* Q. That is a reflex from pain; is that right? A. Yes, sir. Q. The muscles stiffen up involuntarily to prevent the pain? A. Yes. Q. That is an objective sign that the man is having pain? A. It can be objective. Q. That is the way you interpreted it? A. Yes. Q. That can't be faked? A. Sometimes it can. Q. In your opinion, was there any reason to believe that he was faking? A. No, sir. Q. Your impression was that he had trouble with his *lower back?* A. *Yes, sir.*"

The Majority also suggests that the plaintiff's complaint about headaches is of recent formulation and that this physical ailment is not connected with the truck accident. The Majority says: "It is further significant that plaintiff failed to complain of any head pain or headaches until December, 1955, when he was treated by Dr. Fisher." The record reveals that the plaintiff complained about headaches from the time the heavy truck collided with him and catapulted him through the air and to the asphalt. Well could he have done so. One is not rendered unconscious for ten minutes as the result of a cerebral blow, without feeling some painful after-effect. Prize fighters who are knocked out by blows on the head do not forget the sledge hammer impact easily. The Majority has utterly ignored the plaintiff's testimony with regard to

his head injury: "Q. It was after the accident you had these headaches four or five times a week and sometimes more? A. Yes. Q. *Did you make complaints?* A. *Complaints?* Q. *Did you tell the hospital about it?* A. *Yes, certainly.* . . . Q. In any event, will you tell us what was done for you at the hospital? A. Yes. They took my ribs and fixed them, and put a cast on my foot and a cast on my finger, and they gave me *some pills to take for my head.* . . . Q. What about your head? When you went back to work in February, how did your head feel? A. *I had two or three headaches a day.* Q. What was wrong with your head? A. I had fainting—like *dizziness,* thinking I was going to fall over, and I had to sit down for a while, and I always had to take something to relieve my *headaches* all the time. Q. Where were these *headaches?* A. From here all the way back here (indicating). Q. From the forehead and they went toward the back? A. Yes. Mr. Croskey: [defendant's attorney] I will agree that he said that."

It would be difficult to imagine a more distressing handicap to a longshoreman than to be subject to fits of dizziness as he carries a piano on his back—down a swaying gangplank.

Competent evidence established that Smith's head condition was the result of the truck accident. Dr. G. R. Fisher testified: "Q. Doctor, assuming that this man was involved in an automobile accident on December 7, 1953; that he was rendered unconscious for a matter of a few minutes; and has had symptoms such as headaches and dizziness; and further assuming the information which you just related to us—are you able to form an opinion as to whether or not the post concussion syndrome which you found in this examination is related causally to the accident which occurred on December 7, 1953? A. Yes. Q. What is your opinion? . . . A. They are causally related."

The Majority, in a slightly veiled effort to depreciate Dr. Fisher's testimony, says that he is an internist who has been practicing for two years. No one questioned his qualifications. He is a thoroughly trained physician, and, whether he has practised for two years or twenty years, it was for the jury to decide whether his testimony was predicated on fact.

In further attempted derogation of the medical testimony presented by the plaintiff, the Majority says: "The opinions expressed were not based on any clinical evidence, unless one can term a limitation of motion as such evidence." But what could be more evidential of a disability than a demonstrated limitation of motion? If a person limps for a long period of time, that fact should be pretty good evidence that there is something wrong with his powers of locomotion. If a young man otherwise healthy cannot lift his arm above his head, that should suggest at least that he would not be qualified to pitch a game in the World Series. Equally so, if by actual observation, study, and palpation, a doctor finds a limitation of motion in a man's back, why should his medical and factual finding be questioned because he has not taken a spinal puncture? A spinal puncture, as interesting and helpful a test as it is, does not represent the infallible horoscope in the sky of a man's physical future.

The Majority Opinion consists of an argument that the jury should have decided differently, but the Majority does not say that the jury was deceived or that there was lacking evidence upon which the jury based its conclusions. In view of the fact that no trial error has been discovered, it can be assumed that the plaintiff will produce the same evidence and in the same manner that he produced it at the last trial. There is nothing to suggest that another jury, upon that same evidence, may not return another verdict for $25,000 or even more. Why, then, another trial?

The Majority suggests that the plaintiff's loss of wages was of little consequence, citing the item of $800 mentioned in the evidence. But the figure of $800 does not take into consideration the increase in wages given to all longshoremen since the plaintiff's accident and which the plaintiff would have received had he not been injured. Moreover, the fact that an injured person's wages may be the same as the rate at which he was paid prior to the accident, or even more, by no means establishes that he has not suffered a reduction in earning power. In the case of *Bochar v. J. B. Martin Motors, Inc.*, 374 Pa. 240, this Court justly said: "Where permanent injury is involved, the whole span of life must be considered. Has the economic horizon of the disabled person been shortened because of the injuries sustained as the result of the tortfeasor's negligence? That is the test. And it is no answer to that test to say that there are just as many dollars in the patient's pay envelope now as prior to his accident. The normal status of a healthy person is to progress, and to the extent that his progress has been curtailed, he has suffered a loss which is properly computable in damages."

It is to be noted also that Smith remained at his employment only because his immediate foreman was able temporarily to find some non-strenuous work for him to perform, such as "checking and pointing." There can be no assurance that this type of assignment will always be available or, if available, that some other foreman will not give it to some other person. When a working man has been tortiously injured, he is entitled to remuneration on the basis of what he has lost in depreciation of his physical strength, agility and endurance, unaffected by acts of fortuitous benevolence which a charitable superior might send in his direction.

In the case of *Carroll v. Pittsburgh*, 368 Pa. 436,

the writer of this opinion, then a Judge of the Court of Common Pleas of Allegheny County, in the interests of justice, ordered a new trial for the plaintiff. This Court reversed. Mr. Justice HORACE STERN, in a very vigorous opinion, with which the whole Court agreed, wrote: "A new trial should not be granted because of a mere conflict in testimony or because the trial judge on the same facts would have arrived at a different conclusion . . . Neither should it ordinarily be granted on the ground that the verdict was against the weight of the evidence where the evidence is conflicting and the jury might have found for either party . . . it would therefore seem clear that there was a palpable abuse of discretion in the court's granting a new trial on the ground that the verdict was contrary to the evidence (meaning presumably the weight of the evidence) and that in the interest of justice a new trial should be had . . . as stated by the late Chief Justice MAXEY in Jones v. Williams, 358 Pa. 559, 564, 565, 58 A. 2d 57, 60: 'While this Court usually supports the action of the trial court in granting or refusing a new trial we do not entirely abdicate our reviewing functions in such cases. This Court, too, has the duty to determine from the record whether or not the jury's verdict was so contrary to the evidence as to shock one's sense of justice and to make the award of a new trial imperative so that right may be given another opportunity to prevail.' It was there held that the court below in invading the province of the jury and nullifying its verdict for the additional defendant, showed a clear abuse of discretion, and the order of the court granting a new trial was reversed. So in Martin v. Arnold, 366 Pa. 128, 77 A. 2d 99, and in Stewart v. Ray, 366 Pa. 134, 76 A. 2d 628, in each of which cases the trial court granted a new trial on the ground that the verdict was against the weight of the evidence and that the interests

of justice required a new trial, it was held, upon a review of the evidence, that the court had abused its discretion and that the verdicts should be reinstated and judgments entered thereon."

How does the reasoning given for a new trial in the case at bar differ from the one given in the case of *Carroll v. Pittsburgh*? The only palpable difference is that in the *Carroll* case the new trial was granted in behalf of the plaintiff, whereas in the case at hand the trial is ordered in behalf of the defendant. Is *that* a difference?