McCluskey, Appellant, v. Poloha.

Argued March 24, 1959. Before JONES, C. J., BELL, MUSMANNO, JONES, COHEN, BOK and MCBRIDE, JJ.

*Harry Alan Sherman,* for appellants.

*George M. Weis,* with him *Weis & Weis,* for appellee.

OPINION PER CURIAM, May 28, 1959:

This is an appeal from the action of the court below in ordering a new trial after a jury had awarded verdicts in the amount of $10,000 to the minor plaintiff and $200 to plaintiff's parents.

The court below in its opinion stated:

"The testimony produced by the plaintiffs shows that the minor plaintiff, then six years old, was struck by defendant's car on July 25th, 1954 while he was crossing Braddock Avenue and Eight Street, in the Borough of Braddock; that he was taken to the Braddock General Hospital and was kept under hospital

care until August 1st, 1954, when he was removed to his home. . . .

"The mother of the minor testified that the boy was under the care of Dr. Milton Chetlin while in the Braddock Hospital and for a short period thereafter and that the child was referred to Dr. David Kosskoff. At the trial, Dr. Chetlin was not called to testify, it being explained that he was then in the State of Florida.

"The mother of the injured boy testified that he failed to recognize her after the accident until the afternoon of the next day; that he remained in the hospital for one week and was taken home, where he remained in bed for two weeks; that he experienced night spells, during which he would sit up in bed, shake and tremble; that the boy entered the first grade in the public school in September; that his memory was not so good; that he was slower in school and couldn't grasp like other children and that his grades went down and he missed school during the first year after the accident because of headaches.

"Dr. Kosskoff was the sole medical witness called by the plaintiffs. He testified that he first saw the minor plaintiff on February 2nd, 1955; that he received a report of the accident and the history from the father; that the child was unconscious for about a half hour and, since the accident, he had complained of pains in the back of his head and that he was quite sluggish and suffered from night attacks, occurring since the accident once or twice every two weeks, which were characterized by shaking and trembling in the extremities, getting out of bed and walking about, after which he had complete amnesia of these events.

"On February 11, 1955, Dr. Kosskoff performed an electroencephalogram, which was not successful; another one was performed on February 18, 1955, from which he found that the child had a borderline normal

record, that is, while there was no pathological record in terms of actual pathology, he felt it was not perfectly normal, at least as normal as it should have been for the boy's age with this kind of recording and that the boy's behavior could be associated with this type of recording.

"On February 28, 1958 another electroencephalogram was performed, at which time he received from the father a small follow-up history that the child continued to have nocturnal habits of crying and terror and continued to have headaches which have improved. This electroencephalogram was normal and showed that the child had recovered from his initial borderline changes, indicated by the previous record.

"Dr. Kosskoff was of opinion that the child had suffered a cerebral contusion at the time of the accident; that the changes in his behavior were the result of the contusion and that the child had made a relatively favorable clinical recovery. However, he was of the opinion that a blow of this kind to the child's nervous system and to his emotional stability *could* alter his general emotional growth; also his ability to work at school, in his thought processes and that the child should have more or less follow-up care in the future.

"It appears that the Doctor's diagnosis depended heavily upon the history given to him by the child's parents. His testimony stresses the importance of this history: 'if, as you described, the history indicates a confusional state, and the general picture as I have developed. . . . I mean if we had another type of history and we saw this record in this child we could assume this was a variant that would not have any significance. . . . [W]e are relying not only on the history that the parents tell us, but the history of the accident, the severity of the blow. This is assuming all this is correct. The fact that the child was apparently confused for at

least 36 hours. . . . It was reported that the child was unconscious, at least in our records, for about a half hour. . . . In the history, we like to know the state of consciousness, which is one of the best criteria for concussion as an entity.'

"It appears to us from the testimony presented in this case that Dr. Kosskoff was not given an accurate history. The hospital records disclose that the child was not unconscious; in fact, the record indicated that the injuries were bruises, brush burns and a mild concussion. There is no testimony to support the history given to the Doctor to the effect that the child had been confused for about thirty-six hours.

"The history concerning the child's slowness at school, his inability to learn like other children, the lower grades received and the time lost is at variance with the facts as disclosed from the school records, which show that the child did not miss a single day's school the entire year after the accident; that he was a straight-A student and that in January 1955 he scored 127 on an I. Q. test in a district where the score of 100 is considered very good. Furthermore, his teacher's entry on the record concerning his behavior was: 'Talkative; takes directions well.' "

An examination of the instant record clearly and frankly reveals that plaintiffs' sole medical witness was compelled to rely upon a medical history of the child-plaintiff as related to him by others as the basis for his diagnosis and for his opinion as to the cause of and the extent of the child-plaintiff's injuries and physical condition. The record further reveals that the medical history as given to the medical witness was not only inaccurate but contrary to the facts as disclosed by the evidence. Under such circumstances we cannot find that the court below abused its discretion in granting a new trial. As we recently stated in *Smith v. L. Blum-*

*berg's Son, Inc.*, 388 Pa. 146, 151, 130 A. 2d 437: "A reading of the medical testimony presented on behalf of the plaintiff—even without considering the medical evidence presented by the defendant—raises very serious doubt as to whether it could justify the verdict. When to this bare record is added the lower Court's disbelief in the reliability or credibility of plaintiff and his doctors, it is impossible for us to say that there had been an abuse of discretion in granting a new trial. . . . 'The rule is well settled that where a trial Judge or Court, who saw and heard the witnesses grants a new trial, we will not reverse unless there is a clear abuse of discretion or an error of law which necessarily controlled the grant of the new trial or the outcome of the case. . . .' "

Order affirmed.

---

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

Maxwell McCluskey, six years of age, was struck by an automobile with such force that he went "sailing" through the air some 15 feet. Eyewitnesses to the accident testified to the violence of the impact: "Well, the car hit him and he was—went up in the air and he flew out." . . . "I mean when he hit it was like —you know how you hit a brick against the wall. It just sounded like that." . . . "He flew up in the air, hit on the left hand side of the car, flew up in the air, hit come down. I heard the screech of brakes." . . . "I heard this thud and I saw my boy sailing." . . . "I picked the boy off the rail and he looked like as though he was dead."

He was picked up in an unconscious state and taken to the hospital. He continued to receive medical care after he left the hospital. Dr. Yale David Koskoff testified that the boy sustained a cerebral contusion,

also called a cerebral concussion. Ever since the accident Maxwell has been assailed by night terrors. His mother testified: "Q. Describe that experience at night. A. He gets up at night. Q. About what time of the night? A. Well, he just hits the bed, I would say. He goes to bed between 8:30 and 9 o'clock. About a quarter to 10 he gets up hollering, sits up in bed or either walks around. We just have to take a damp cloth to him and all. It takes sometimes 10 minutes, 15 minutes to pull him out of it. . . . Q. Now, from the time that he came home in August of 1954 to the present day have you observed whether there is any improvement in his condition about these night difficulties? A. No. They are getting worse. First they would be maybe one a month. It seems to get worse now as time goes on. He is losing weight over it. I know it. Even with the tonic he takes it doesn't seem to help. Q. He is still under the care of Dr. Koskoff? A. Yes, sir."

It appears that the boy will need medical and neurological attention for some years. Dr. Koskoff testified: "Q. About how long would you say it would be before you could honestly professionally say that the boy has no further need for any medical or neurological examination or follow-up? A. I think ideally this child should be under the supervision of a person in the psychological field, not necessarily a psychiatrist but a person trained in psychology. I say easily through his adolescence, to see how he handles his adolescence period as a result of what is now going on with him. Q. Why is that, Doctor? A. First of all, it gives us a follow-up of another several years. And the stresses of adolescence could give him more problems as a result of his present behavioral difficulties. I would like to see this kid go through his adolescence before I would be sure just what is going to happen with him emotionally."

The jury awarded him $10,000. The Trial Judge reversed the verdict and ordered a new trial on the ground that the verdict was excessive. In *Stark v. Lehigh Foundries Co.*, 388 Pa. 1, 23, this Court said: "The verdict must be clearly and immoderately excessive to justify the granting of a new trial. The amount must not only be greater than that which the Court would have awarded, but so excessive as to offend the conscience and judgment of the Court . . . The imperative test of excessiveness of the verdict is whether it shocks the sense of justice of the Court."

My sense of justice is not shocked by a verdict of $10,000 for a boy, now only nine years of age, who suffers night terrors and has a brain involvement which may develop into serious complications, not excluding epilepsy. In fact, I am shocked that this Court is shocked by a verdict which, I believe, under the circumstances, is actually modest.

I am also shocked at the inconsistency of this Court and by that expression I do not mean the contrasting of today's position with some enunciated principle of years ago. I refer to a decision handed down during this very session of Court, which contradicts what is being done here today. In the case of *Elza v. Chovan*, 396 Pa. 112, the Trial Court ordered a new trial because the verdict was *inadequate*. This Court *reversed* the Trial Court and thus rejected the idea of a new trial. Today the Majority Opinion affirms the Trial Court which declared that the verdict was excessive and orders a new trial. Why should the Court be shocked when the Trial Judge orders a new trial because the verdict is excessive and not be shocked when the Trial Judge orders a new trial because the verdict is inadequate? What is the standard to apply in considering the amounts of verdicts. Does too much of an award shock more easily than too little?

Where is the consistency?
Where is the logic?
Where is the justice?
I dissent.