Takac, Appellant, v. Bamford.

Argued March 27, 1952. Before DREW, C. J., STEARNE, JONES, BELL, CHIDSEY and MUSMANNO, JJ.

*George S. Goldstein,* for appellant.

*Ernest C. Reif,* with him *Dickie, McCamey, Chilcote, Reif & Robinson,* for appellees.

OPINION BY MR. JUSTICE JONES, April 23, 1952:

The plaintiff sued to recover damages for personal injuries suffered while a passenger for hire on a bus of the defendant firm. The negligence charged was the driver's failure to operate the bus properly and the alleged faulty and defective bus equipment. At trial,

the jury rendered a verdict for the plaintiff in the sum of $3,000. The plaintiff moved for a new trial alleging that the jury's verdict was inadequate and that the inadequacy was the result of basic and fundamental error in the charge of the trial judge. The court en banc denied the plaintiff's motion and entered judgment on the verdict. The plaintiff brought this appeal and assigns for error the lower court's refusal of his motion for a new trial.

The matter whereof the appellant complains was neither basic nor fundamental error. Indeed, it was not error at all. The learned trial judge properly charged the jury that the burden was on the plaintiff to prove that negligence of the defendants was the proximate cause of the injury for which he sought damages. The court then instructed the jury that, if they found the accident was due to defective brakes on the bus, as the evidence for the plaintiff indicated, it was then incumbent on the defendants (a common carrier) to produce evidence of exculpatory care on their part in respect of the bus's equipment. That instruction was manifestly correct: see *Nebel v. Burrelli,* 352 Pa. 70, 74-75, 41 A. 2d 873; and *Archer v. Pittsburgh Railways Company,* 349 Pa. 547, 548-549, 37 A. 2d 539.

What the plaintiff really complains of is that the trial judge left it to the jury to say whether an inspection of the brakes (merely "cursory" as the court denominated it) by the driver just before descending the hill where the bus went out of control from a failure of its brakes met the burden on the defendants in relevant regard. We fail to see how the court could have excluded such evidence from the jury's consideration without risking possible error against the defendants to the jeopardy of any verdict the plaintiff might recover. It may well have been for that reason that plaintiff's counsel did not question the particular submission at the time of the charge. In any event, it was

not until after the jury had retired to deliberate on its verdict that plaintiff's counsel casually observed, —"I was wondering, your Honor, if that was a fair statement of the law, that the mere fact that the driver had made his effort to test the brakes could be considered by the jury as evidence of exculpation . . . ." Obviously, the subject matter of counsel's present complaint with the charge was in his mind at the time. Yet, he failed to make any request for further or other instruction. On the contrary, when the trial judge inquired expressly whether plaintiff's counsel had "anything further", he replied—"No, your Honor, you have covered everything."

It is clear that the driver's testimony about testing his brakes could not properly have been ignored by the court when applying the law to the testimony. The only possible question open to the plaintiff in that connection is whether the trial judge adequately indicated the weakness of that testimony. It was the plaintiff's duty, if he felt harmed in such regard, to request the court's elaboration or further instruction with respect to the extent of the probative value of the exculpatory testimony. Counsel, not having so requested, cannot now charge the court with failure to instruct the jury adequately. As said by Mr. Justice STERN in *Susser v. Wiley*, 350 Pa. 427, 430, 39 A. 2d 616,—". . . a party may not remain silent and take his chances on a verdict, and then, if it be adverse [or disappointing], complain of an inadequacy which could have been corrected."

But the charge was not inadequate in the particular assailed by the appellant. With marked fairness to the plaintiff, the trial judge effectively minimized the driver's testimony as to his testing of the brakes. Thus, the court said to the jury,—"As I stated originally, if they can establish that this was an accident which occurred without any fault or negligence on their part,

then there can be no recovery. However, the defendant did not establish or offer any evidence to exculpate themselves or to show that they were not negligent, and the only evidence that I observed in the case that might indicate anything in that connection was the testimony of the driver himself [in the plaintiff's case], who made a cursory examination just before taking the bus out of the terminal. . . . It would seem to me that a common carrier upon whom is the burden of exercising the highest degree of care, not only in operating its buses, but in providing a bus that was in good order, should offer additional testimony demonstrating the fact that they were not negligent. That is the situation here insofar as the liability feature of this case is concerned." The plaintiff could not justly have asked more.

Nor was the plaintiff harmed by the court's submission of the driver's exculpatory testimony. As indicated by the last sentence of the foregoing quotation, such testimony went only to the question of the defendants' *liability* and the jury held them liable in a not unsubstantial sum. Even had the submission been error, it was harmless in view of the result. Cf. *Garris v. Bell*, 253 Pa. 33, 34, 97 A. 1034, aff'd. per curiam.

How we could justifiably conclude from the record in this case that the verdict was inadequate is not apparent. Of course, by comparing the amount of the verdict with the extent of damages which the plaintiff asserted, the verdict would appear not to have been compensatory. The fact is, however, that there were serious conflicts in the evidence adduced by the plaintiff with respect to the character of the work he had performed prior to the accident, the effect of the injury on his ability to return to work and the probable duration of his incapacity. It is true that the plaintiff remained away from work for twenty-one months following his injury. However, there is noth-

ing but his unsupported word to suggest that his injury required him to remain away from work so long. His doctor and medical witness at trial testified that the injury, as revealed by the X-ray, had healed satisfactorily in ninety days. By his own admission, the plaintiff was driving around seven months after the accident in the automobile which he had just purchased and attended moving picture shows and went walking with the young lady with whom he was keeping company. He very patently tried to create the impression by his testimony that his work at a local steel mill had required him to do heavy lifting for which the injury had incapacitated him, while the fact is that his work for six-sevenths of the time of his employment, as testified to by his witness from the pay department of the steel company, had been clerical,—the same kind of work he was given to do when he finally did return to work. He even resumed the stand to contradict this disinterested witness (his own) who had testified from documentary records. It was the province of the jury to appraise the worth of the testimony and, in so doing, the jury very evidently did not accredit some of the elements of the plaintiff's asserted damages. What was said in *Zamojc v. Fisher,* 127 Pa. Superior Ct. 171, 172, 193 A. 315, is especially apposite here: "The verdict is small, having regard to the plaintiff's evidence as to his injuries and expenses in connection with them, but it is substantial and not merely nominal . . . . The amount of the verdict was not enough to reimburse plaintiff for his time lost from work because of the accident, *according to his testimony,* and for his medical and hospital expenses, without any allowance for pain and suffering. But the jury might well have found that the doctor's bill was padded, and it was for them to decide whether the injury he received required his absence from work for eighteen weeks" (Emphasis supplied).

In the instant case, the court en banc in an opinion written by the learned trial judge, who saw and heard the plaintiff and his witnesses, both lay and medical, after a careful review of the evidence as to damages and the conflicts therein, concluded that it could not properly disturb the jury's finding. The grant or refusal of a new trial for inadequacy of the verdict is a matter for the sound discretion of the trial court whose action will not be reversed on appeal except for a clear abuse of discretion such as where a new trial is refused when the verdict is so unreasonably low as to present a clear case of injustice: *Fabel v. Hazlett*, 157 Pa. Superior Ct. 416, 422, 43 A. 2d 373; *Patterson v. Pittsburgh Railways Company*, 136 Pa. Superior Ct. 432, 7 A. 2d 478; and *Zamojc v. Fisher*, supra, at pp. 172-173. The record in this case discloses no such abuse.

Counsel for the appellant, in his zeal to demonstrate that the verdict is inadequate, has improperly injected on this appeal, both by brief and oral argument, reference to an offer of settlement made by defendants' counsel at trial which the plaintiff rejected. Such matter is no part of the record of the case and has no proper place before us. It is just as improper for counsel to try to sway a reviewing court with statements as to offers of settlement made in the course of the litigation as it is to endeavor to impart such information to a jury. A litigant is not to be penalized for the liberality of his offer of settlement which his adversary refused to accept.

Judgment affirmed.

---

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

On May 8, 1948, a motor bus belonging to the defendant partnership Bamford Brothers, while proceeding on a declivitous roadway in the Borough of Mun-

hall, Allegheny County, broke out of control, dashed down the road way at a high rate of speed, crashed into an embankment as a result of the driver's attempt to stop it, jolted over on its side, righted itself again and finally came to a halt, to the concomitant consternation of all the passengers and to the injury of some. Among the injured was one Joseph V. Takac, plaintiff in this case.

He brought suit against the defendants and obtained a jury's verdict in the sum of $3,000, which verdict, over his motion for a new trial on the ground of inadequacy, was affirmed by the lower Court.

The verdict of the jury established that the bus-owner was negligent and it established further that the plaintiff was injured as the result of *that negligence*. The evidence is unchallenged that the plaintiff, with the exception of one day's attendance at his job (in order to avoid a technical lay-off) was absent from his employment from May 8, 1948, to January 9, 1950. There is no evidence in the record that he was physically able to work during that period. A payroll clerk for the Carnegie-Illinois Steel Company, the plaintiff's employer, testified that Takac's wages amounted to $2,600 a year.

X-rays of the plaintiff's back revealed fractures of the lumbar transverse processes on the right side with muscle spasm of the erector spinae muscles. Dr. Samuel J. Rosen, who saw the plaintiff on April 18, 1949, testified that an "examination of the motions of the back showed at that time that there was approximately fifty percent restriction or limitation of motion, of all motions in the lumbar spine, that is forward or backward bending and side bending and radiation." The doctor further testified: "Q. Doctor, did the fracture of these transverse processes result in any injury by the fractures themselves? Did they result in any injury to any other parts in the neighborhood? A. Well, any

force sufficient to produce fracture of any part of the vertebra is certainly sufficient to damage the supporting structures which are attached to those bones. Q. What are those supporting structures? A. Ligaments and muscles." This testimony was at first stricken from the record but the doctor's further answers later reinstated it. The doctor also testified that the plaintiff would have a permanent partial disability.

Dr. Shakari T. Ilyas, the plaintiff's personal physician, testified that over a period of two years he administered some 110 treatments to the plaintiff, the treatments consisting of diathermy, heat and massage. He also prescribed for the plaintiff lumbo-sacral braces, of which the plaintiff consumed three prior to the date of trial.

The plaintiff testified that he experienced much pain as the result of his injuries and that, although he was eager to return to his job,—because of economic necessity—and attempted on several occasions to do so, he was physically unable to perform the work assigned him. He had been employed at the Carnegie-Illinois plant for twelve years prior to the accident, working at the open hearth, in the structural rolling mills and as a hooker (chaining beams.) At times he also did clerical work, referred to as "slip maker."

For four months following the accident Takac's condition was such that he was unable to straighten up and he had to walk in a stooped position. The testimony at the trial indicated that although only 37 years of age he now tires easily, is unable to do heavy work, cannot walk reasonable distances, has difficulty in sleeping because of the pain in his back, and cannot even do the usual chores expected of a man around the house. Athletically inclined before the accident, he cannot now engage in such mild exercises as bowling and dancing. The muscular and nerve disorganization of his back is such that he cannot even sit comfortably

in a movie theatre for the entire showing of a picture.

The doctor called by the defendant testified that he saw the plaintiff for the first time on October 24, 1949, and in less than a half-hour's examination concluded that the plaintiff had recovered fully from his original injuries. Even if this testimony were to be accepted at full face value, it would in no way negative the testimony as to the plaintiff's disabilities and incapacities *prior* to October 24, 1949.

Dr. U. A. Carpenter, the physician just referred to, was the only witness called by the defendant. Thus all the evidence introduced by the plaintiff as to his physical condition before October 24, 1949, and the evidence introduced as to time lost from work, stand uncontroverted. Of course, if the jury saw fit to do so, it could have disbelieved *all* the testimony presented in behalf of the plaintiff and have returned a verdict outrightly for the defendant; but once it proclaimed in favor of the plaintiff and thus held the defendant responsible for the plaintiff's losses, it could not reject the mathematical losses proved on behalf of the person for whom they had so categorically decided.

The jury could have turned a deaf ear to the testimony on pain, suffering and inconvenience endured by Joseph Takac and to be further endured by him, but it could not arbitrarily discard the evidence of actual financial loss from his pocket—in the absence of anything to the contrary from the witness stand.

A jury may distrust witnesses but it cannot ignore arithmetic. Once it acknowledges the digits of 2 and 2, it must accept the total of 4. By its verdict the jury established the defendant's negligence and the plaintiff's disability *as the result of that negligence*. The plaintiff's wages of $2600 per year were unquestioned, his absence of work for 21 months was undenied. He, therefore, in wages alone lost $4500. His medical expenses totaled $682.75. His out-and-out financial im-

pairment up to the time of the trial, allowing nothing for pain, suffering and inconvenience (which, in itself, was not inconsiderable and must be conceded from the evidence) was $5232.75. How, in the face of those established figures can the sum of $3,000 be accepted? Unless we are to put a stamp of approval on a verdict which defies the simplest blackboard problem in addition, a new trial here is imperative. This verdict should not be allowed to stand any more than a verdict which would declare a party litigant owner of a disputed property but would deny him the right to enter that property.

Our Supreme and Superior Court reports abound with decisions to the effect that where a verdict is so grossly excessive as to shock our sense of justice, the verdict must be reduced or a new trial ordered. If we can be shocked by an excessive verdict, why can we not be shocked by an obviously inadequate verdict? If too much causes a revulsion, why shouldn't *too little* awaken an equal abhorrence? If we recoil from a verdict which is bloated, why should we be indifferent to a verdict which is gaunt?

Why should an overfull larder shock our conscience more than an empty or half-full one? Why should an extra loaf of bread be more disturbing than a desiccated crust?

If we take a jury's verdict as an impeccable and infallible judgment, then it should not be disturbed whether an appellate court believes the amount of the verdict is too plentiful or too meager. But if an appellate court may, and it does, substitute its judgment for the jury's judgment when the jury overfills the well, why should it decline to intervene when the jury empties the well? If a jury can be corrected when it overstocks the pantry, why should the correcting measure be withheld when the jury strips the pantry bare?

The jury system is the best system devised in all the centuries for the ascertainment of justice between man and man. Being human, of course, it is subject to error just as judges may err also. But the greatest virtue of our whole system of government, not only in the administration of justice, but in every phase of our democratic procedure, is the check and balance device whereby no person or group of persons may have autocratic or absolute power unreviewable by anyone else. Thus, to direct a new trial because of error committed by a jury is not to discredit or even criticize the jury involved and certainly not to belittle the jury system in general. It is simply the putting into effect of the genius of our check-and-balance system.

In view of all these considerations, I would reverse the judgment of the lower Court and order a new trial.