## Elza *v.* Chovan, Appellant.

Argued March 19, 1959. Before JONES, C. J., BELL, MUSMANNO, JONES, COHEN, BOK and McBRIDE, JJ.

reargument refused July 1, 1959.

*Theodore M. Tracy,* with him *Edward O. Spotts,* for appellant.

*Thomas F. Weis,* with him *Weis & Weis,* for appellee.

OPINION BY MR. JUSTICE BOK, May 28, 1959:

Plaintiff was the passenger on a motorcycle. Following its collision with an automobile a jury held both drivers negligent and awarded plaintiff $950.

The lower court gave plaintiff a new trial for inadequacy, but the Superior Court reversed and entered judgment on the verdict. An allocatur to this court was allowed.

The reason given by the court below for its action is this: "We are here confronted with a difficult decision. The court may well accept either side of the coin. The plaintiff failed to tell the truth as to his injuries and the jury apparently did not believe him. But notwithstanding this fact and eliminating any award for pain and suffering and the amount for the services of Dr. Strassley, who treated his back, the plaintiff did prove damages in the amount of $1375. The jury awarded him $950. This sum is not adequate and a new trial will be granted."

The general rule in such cases is: "The granting or refusal of a new trial because of the inadequacy of the verdict is a matter peculiarly within the discretion of the trial court, and it is the rule in this State that an appellate court will not reverse the action of the court below unless the verdict is so unreasonable as to bring conviction that it was influenced by partiality or prejudice or some misconception of the law or the evidence in the case . . . and establish a clear case of wrong and injustice in the court below": *Zamojc v. Fisher,* 127 Pa. Superior Ct. 171, 193 A. 315 (1937); *Takac v. Bamford,* 370 Pa. 389, 88 A. 2d 86 (1952).

It is the province of the jury to assess the worth of the testimony and to accept or reject the estimates given by witnesses. If the verdict bears a reasonable resemblance to the proven damages, it is not the function of the court to substitute its judgment for the jury's: *Paustenbaugh v. Ward Baking Co.*, 374 Pa. 418, 97 A. 2d 816 (1953); *Perzak v. Coulter*, 171 Pa. Superior Ct. 475, 90 A. 2d 256 (1952).

The mere fact that a verdict is low does not mean that it is inadequate. Nominal damages have been upset: *Bradwell v. Railway Co.*, 139 Pa. 404, 20 A. 1046 (1890); *Spence v. Stockdale Borough*, 57 Pa. Superior Ct. 622 (1914), and have been allowed to stand: *Palmer v. Leader Publishing Co.*, 7 Pa. Superior Ct. 594 (1898).

The same is true of low but substantial verdicts. In *Stevens v. Frank*, 151 Pa. Superior Ct. 222, 30 A. 2d 161 (1943), a judgment of $200 for a wife and nothing for her husband was affirmed. In *Ewing v. Marsh*, 174 Pa. Superior Ct. 589, 101 A. 2d 391 (1953), a verdict of $3000 was upheld, the court saying: "This was low, but certainly not a nominal verdict such as would give rise to an inference of mistake or partiality by the jury." And in *Alleva v. Porter*, 184 Pa. Superior Ct. 335, 134 A. 2d 501 (1957), where the verdict was low but substantial, the grant of a new trial was reversed and judgment was entered on the verdict.

There is no magic in amounts but only in the circumstances, and compromise verdicts are both expected and allowed: *Karcesky v. Laria,* 382 Pa. 227, 114 A. 2d 150 (1955). The compromise may arise out of damages or negligence or the balance of evidence concerning either or both, and the grant of a new trial may be an injustice to the defendant rather than an act of justice to the plaintiff: see *Patterson v. Palley Mfg. Co.*, 360 Pa. 259, 61 A. 2d 861 (1948).

Merely because the verdict is less than the expenses is no criterion. In *Crow v. Deems*, 163 Pa. Superior Ct. 591, 63 A. 2d 119 (1949), the grant of a new trial was affirmed when the verdict was $900 and the expenses about $2900, and the Superior Court cited *Pretka v. Wilson*, 325 Pa. 491, 190 A. 722 (1937) in support; but in *Pretka* the verdict was $2750 and the special damages $1600 plus future expenses. On the other hand, in *Carpenelli v. Scranton Bus Co.*, 350 Pa. 184, 38 A. 2d 44 (1944) the refusal of a new trial was affirmed where verdicts and expenses were about the same.

It is clear that the court below was in error when it said: "Judged solely from the proven out-of-pocket expenses and failure of the jury to award any sum for pain, suffering, and inconvenience, this verdict is inadequate." The basis of judgment cannot be solely the ratio of verdict to expenses: there is a plethora of other factors, such as the plaintiff's proven untruths in the case at bar. One of them concerned the amount of time that he lost from work, and since the jury could have felt that what time he actually did lose was not due to the accident the court misspoke when it said flatly that "plaintiff did prove damages in the amount of $1375."

Plaintiff also lied about his back. During his testimony he denied previous trouble with it, but records of the Veterans' Administration showed that in July, 1946, he complained of back trouble for several years. The jury were at liberty to find either that he lied in 1946 in order to cheat the government and get a pension or that he lied on the stand in order to cheat the defendant and get damages. And the jury might have believed that Dr. Strassley's bill for sixty-eight visits over four years, when plaintiff was away from work only eleven weeks, was exorbitant.

This verdict was obviously a compromise. The jury sent a written note to the trial judge saying: "Albert N. Elza versus Joseph Chovan, our verdict is negligence on both sides. In Hansford W. Elza versus Joseph Chovan can we throw this out of court?" After receiving proper instructions, the jury retired and came back with its final verdict as recorded.

While the appellate courts tend to uphold the trial courts, they do not abdicate their powers of review: *Decker v. Kulesza*, 369 Pa. 259, 85 A. 2d 413 (1952); *Ropele v. Stewart*, 185 Pa. Superior Ct. 522, 137 A. 2d 895 (1958). It is their duty to review the evidence to see whether there was a clear case of injustice: *Nikisher v. Benninger*, 377 Pa. 564, 105 A. 2d 281 (1954).

In discharging that duty some trademark must appear by which to distinguish cases of clear injustice from those in which the court below has merely ousted the jury and moved into their seats. Certainly the trial courts should give reasons for what they do when the issue is the weight of the evidence or the interests of justice: *Belletiere v. Philadelphia*, 367 Pa. 638, 81 A. 2d 857 (1951).

Trial courts cannot avoid gross abuses of discretion or convince us that a verdict is so unreasonably low as to present a clear case of injustice without using words of appropriate urgency and decisiveness.

In *Crouse v. Smith*, 381 Pa. 431, 113 A. 2d 223 (1955), the trial judge called the verdict "miserly" and "patently insufficient". In *Schwartz v. Jaffe*, 324 Pa. 324, 188 A. 295 (1936), we called the verdict "patently insufficient". In *Bradwell v. Railway Co.*, supra (139 Pa. 404), nominal damages were described as "inconsistent and unreasonable" and "a travesty of justice". In *Richards v. Beaver Valley Traction Co.*, 105 Pa. Superior Ct. 248, 161 A. 596 (1932), the court spoke of "very clear cases of wrong or injustice which the court below should have remedied".

There is nothing in the opinion of the trial court here that reflects such ideas. It speaks only of the case being difficult and says that it "may well accept either side of the coin". There should be nothing difficult about a decision to grant a new trial for inadequacy: the injustice of the verdict should stand forth like a beacon. Nor, weighing difficulties, may a court resolve them with a coin, when the result is to overturn the verdict of a jury reached on dubious evidence of damages.

We conclude that the grant of a new trial was a gross abuse of discretion.

The judgment of the Superior Court is affirmed.

Mr. Justice McBride dissents.

––––––––––––

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

On April 23, 1953, the defendant in this case, Joseph A. Chovan, so negligently and violently drove his automobile into the path of a motorcycle that Hansford W. Elza, 33 years of age, who was a passenger on the latter vehicle, was catapulted over the top of the cycle and the summit of the automobile, landing on the concrete highway, sustaining such injuries that he had to be removed by ambulance to a hospital where he remained seven days. He left the hospital on crutches and underwent medical care at his home where he was immobilized for an undetermined number of weeks. He was so disabled that he could not resume his occupation of structural iron worker for a period of from 11 to 13 weeks. He brought suit against the automobile owner, and the jury returned a verdict in his favor in the sum of $950. The lower court declared this verdict inadequate under the evidence and ordered a new trial. The defendant appealed to the Superior

Court which reversed the lower court's order, and we allowed allocatur.

This Court has now affirmed the decision of the Superior Court, thus sustaining the reversal of the lower court's order, and, in doing so, I respectfully submit, it has disregarded the applicable law, it has glossed over the facts, and it has treated cavalierly the considerate judgment of three trial judges who were closer to the locale, realities, and personalities involved than we can ever approach through appellate binoculars. The three judges of the court en banc which ordered the new trial were no amateur jurists, their robes shining with the newness of the tailor's art. Their combined trial judicial experience totaled 60 years. The judge who tried the case and who wrote the opinion for the court en banc has graced the bench of Allegheny County for 28 years. In expressing the unanimous view of the court en banc the trial judge said:

"The injuries which he [the plaintiff] sustained resulted in the following medical expenditures and earning losses:

| | |
|---|---|
| Citizens General Hospital | $ 113.25 |
| Dr. L. J. Fronduti | $ 85.00 |
| Dr. C. M. Strassley | $ 367.00 |
| 2 Lumbo Sacral Supports | $ 20.00 |
| 11 weeks lost earnings at $125 | $1,375.00 |
| | $1,960.25 |

. . .

"Dr. Fronduti, the hospital surgeon, as well as Dr. Strassley, the family physician, testified that a period in excess of eleven weeks would have been a reasonable absence from structural iron work for a man who had sustained plaintiff's injuries. The defendant's expert, Dr. Epstein, though cross-examined about this matter,

made no attempt to deny that such an absence was well warranted.

"The hospital bill for Hansford W. Elza was in the sum of $113.25. The bill of Dr. Fronduti, who attended the plaintiff during his hospitalization, was $85. Consequently, the medical expenses immediately following the accident totalled the sum of $198.25. Even disregarding the further treatment which was rendered by Dr. Strassley, whose charges were $367, and disregarding the cost of the two lumbo-sacral supports, the out-of-pocket losses, about which there could be absolutely no doubt, totalled $1,573.25, or $623.25 more than the verdict. This is so even if we accept the testimony of Dr. Epstein, the defendant's expert. That the plaintiff suffered pain directly and solely attributable to the accident, at least for a period of several weeks following the accident, cannot be disputed. The jury did not find the plaintiff contributorily negligent. Therefore, the plaintiff was entitled to be compensated fairly and adequately for injuries directly attributable to the accident."

Surely it cannot be denied that the plaintiff is entitled "to be compensated fairly and adequately for injuries directly attributable to the accident." On what basis, therefore, does this Court reverse the lower Court? We have said up here, with metronomic, monotonous repetition that we will not reverse a trial judge who has granted a new trial on the basis of an inadequate verdict unless the judge has usurped an authority with which he is not vested. The writers of the Opinions of this Court have strained for rhetorical emphasis in proclaiming the faith that this Court cherishes in the knowledge, wisdom, and judicial acumen of trial judges in matters of this kind. They have said that: "The grant or refusal of a new trial for inadequacy of the verdict is a matter for the sound discretion of the

trial court whose action will not be reversed on appeal except *for a clear abuse of discretion.*" (*Takac v. Bamford,* 370 Pa. 389.)

They have said that: "An order awarding a new trial will not be reversed on appeal unless *a palpable abuse of discretion* on the part of the court below is clearly shown." (*Crouse v. Smith,* 381 Pa. 431).

They have said that: "The power to set aside a verdict on the ground of inadequacy may be exercised whenever it appears to the court below that the amount is patently insufficient; an appellate court will not interfere with its exercise of discretion in this matter unless *a gross abuse** appears." (*Schwartz v. Jaffe,* 324 Pa. 324).

Yet today, although, assertedly, loath to reverse the awarding of a new trial unless the trial judge has clearly, palpably, and grossly abused his discretion, this Court is here doing that very thing—this, in spite of the fact, that the reversed verdict is clearly, palpably, and grossly inadequate. In the case of *Todd v. Bercini,* 371 Pa. 605, the trial judge ordered a new trial because the verdict was inadequate. The defendant appealed, asserting that the trial judge had clearly, palpably, and grossly abused his discretion. We were not impressed by his argument. We affirmed the granting of the new trial and said: "A trial is a systematized, organized procedure for determining the truth and awarding justice with precision, to the extent that precision can be ascertained through fallible human agencies. A trial is not to be a mere conscious *approximation of reality.* It is not the province of a jury to decide *generally* the issue presented to it for decision, in the spirit of boundless generosity or restrained benevolence. If Mrs. Todd was entitled to a verdict from the

---

* All emphasis supplied.

defendant because of his negligence, she was entitled to *all* that the law provides in such a case. And the items of pain, suffering, and inconvenience, as well as loss of wages and impairment of earning power, are inevitable concomitants with grave injuries when suffered by a wage-earner. A jury may not eliminate pain from wounds when all human experience proves the existence of pain, and it may not withhold lost wages when the evidence in the case uncontradictedly establishes the loss of wages as the result of the negligence which they, the jury, have adjudicated against the responsible defendant. When it is apparent that a jury by its verdict holds the defendant responsible for a whole loaf of bread, it may not then neglectfully, indifferently, or capriciously cut off a portion of that loaf as it hands it to the plaintiff."

This decision was rendered in 1952. Has bread in the intervening time lost nutritive value so that it does not matter how much of a loaf is withheld from a deserving plaintiff?

To admit that an injured plaintiff was without fault, to concede that the defendant was wholly at fault, to acknowledge that the plaintiff lost at least $1960.25, and then hand him only $950, completely ignoring the item of pain, suffering, and inconvenience, is to introduce the standards of a pawn shop into the sacred temple of justice.

Over and over this Court has said that if the verdict is so excessive that it shocks our judicial conscience, the verdict must be reduced or a new trial ordered. What if the verdict is inadequate? Should our judicial conscience not also then be shocked? I do not understand an attitude which manifests great shock over an excessive verdict and an utter indifference to an inadequate verdict. In my dissenting opinion in the case of *Takac v. Bamford*, 370 Pa. 389, I spoke on

the subject of inadequate verdicts: "If too much causes a revulsion, why shouldn't *too little* awaken an equal abhorrence? If we recoil from a verdict which is bloated, why should we be indifferent to a verdict which is gaunt? Why should an overfull larder shock our conscience more than an empty or half-full one? Why should an extra loaf of bread be more disturbing than a desiccated crust?"

A jury may accept or reject testimony but it cannot ignore arithmetic. Once it piles two bricks on two other bricks, it must accept the total of the bricks to be four. And this Court has no authority to challenge the integrity of that mathematical reality. The undisputed evidence in the Court below is that the plaintiff lost in countable currency and coin the amount of $1960.25. How can we say that we are not shocked when that sum is transmuted into $950?

In this case this Court had an opportunity to uphold the decision of the trial judge in a matter in which we have so often said that the trial judge is better qualified to speak than an appellate court which does not see the parties and the witnesses. However, instead of considering the well-reasoned opinion of the trial judge in the case at bar, this Court has set itself up as a punitive tribunal to punish the plaintiff because it is alleged he transgressed in the trial.

One of the results of the accident of April 23, 1953, was a weakening of the plaintiff's back. At the trial he was asked whether he had ever before had any trouble with his back and he answered in the negative. The defendant then introduced a record to show that in July, 1946, seven years prior to the accident, the plaintiff, who had served in the United States Army, applied for a pension because of a "back condition." The Majority Opinion says that: "The jury were at liberty to find either that he lied in 1946 in order to cheat the

124

government and get a pension or that he lied on the stand in order to cheat the defendant and get damages."

This, I submit, is not only an uncharitable and unwarranted analysis of the situation but one which has no basis in fact. There is no evidence whatsoever that Elza tried to "cheat the government." The Majority Opinion fails to state, although it is in the record, that the plaintiff did not receive any money from the government. The government found, after taking X-rays and making other tests, that Elza did not have that kind of a disablement which entitled him to a pension. Moreover, it is to be noted, which the Majority Opinion also failed to state, that Elza's claim for a pension was not based alone on an alleged ailing back. The claim was predicated on "fungus condition of ears, back condition November 1943, stomach condition October, 1945, hernia, 1946, and athlete's foot 1943." Thus, the so-called back condition was only one item in a list of complaints.

Elza could well have mistakenly thought in 1946 that there was something seriously wrong with his back. If he did, he would not be the first one to be concerned over an "aching back", and to worry and fret over it, only to learn, with infinite relief, after tests and X-rays, that his pains were but ephemeral and that the aching back was only a passing indisposition of which mankind has so many. Thus, when Elza was asked at the trial whether he had had any trouble with his back he said that he did not. The United States Government had said that his back was normal, it found that he had no "musculo-skeletal" defect. Was he to enter into a dispute with the finding of the government? Moreover, he had another good reason to believe that he had a strong back in spite of an evanescent discomfort which he felt seven years before.

After he left the army he obtained employment as a structural iron erector. No one who has had the slightest acquaintances with the work of a structural iron worker can fail to know that such a worker cannot do his job well, if at all, and certainly not safely, if he has a weak back. A structural iron worker must scale girders, climb over beams, swing out into space at the end of a cable, "shinny up columns", dangle over an abyss of emptiness while driving rivets and bolts. It could only be by closing one's eyes to reality that one could say that so strenuous, dangerous, and arduous job could be done by one whose back was less than strong, durable, and free from pain.

For four years immediately preceding the accident in April, 1953, Elza, then, worked as a structural iron erector. Thus, for four years prior to the accident he had a back, and had to have a back, which required the combined health, strength, and suppleness of a blacksmith and acrobat. Of what relevancy, therefore, I would like to inquire, is it whether he had a weak back seven years prior to the accident? He had a good back on April 23, 1953. *That* is the back which the defendant injured, strained, and disabled. *That* is the back which caused the plaintiff to be hospitalized, *that* is the back which caused him to walk on crutches for many weeks, and *that* is the back which compelled him to wear back braces. (None of this evidence was disputed by the defendant.) Thus it was *that* back of *1953* for which the defendant was responsible, not the back of *1946*.

The Superior Court, which this Court affirms, said that Elza "did not tell the truth about the date of his return to work." The plaintiff stated that he had lost twelve to thirteen weeks from work; the records introduced by the defendant showed that he lost eleven weeks work. The accident occurred in April, 1953, the

trial did not take place until November, 1957. Because a workman makes a mistake of a week or two in recalling what happened 43 months before, is he to be characterized a liar? Moreover, to haggle over this one week's pay is sheer waste of time because the lower court, in ordering a new trial, proceeded on the basis that he was entitled only to eleven weeks' lost wages, the period admitted by the defendant. The wrangle over whether the plaintiff was disabled eleven weeks or thirteen weeks amounts to counting seeds in a watermelon since the *defendant's* own medical expert testified that even a *fifteen-week* incapacitation after the injuries described would not be an unreasonable period for the plaintiff to remain away from work.

The defendant, the Superior Court which reversed the lower court's awarding of a new trial, and this Court which sustains that reversal, have all demonstrated an attitude of fault-finding which, it seems to me, aims at a ship and misses the ocean. The fact that the plaintiff was away from work eleven weeks, instead of twelve or thirteen as he recollected, should not deprive him of lost wages for those eleven weeks of *proved* incapacitation. Even if we assume that the jury had the right to deny Elza compensation for pain, suffering and inconvenience, it had no right to reimburse him for only three weeks' lost wages when the defendant's own records, as above stated, demonstrate that he lost eleven weeks' wages.

The Majority Opinion, endeavoring to explain the jury's action, says: "the jury could have felt that what time he actually did lose was not due to the accident."

Of course, there is no limit to what the jury "could have felt" if it wanted to soar into the heights of fantasy. Drawing on imagination, instead of facts, the jury "could have felt" that the plaintiff was absent from work because of having consumed too much whis-

key, or that he had fallen from the roof of his house, or that he had fallen out of a balloon. There is no boundary to what the jury "could have felt" if it wanted to be perverse, but this Court has no right to say on the record that the jury felt that the time the plaintiff lost "was not due to the accident." There is as much reason to assume that the jury simply made a mistake in arithmetic as there is to say that the jury felt the plaintiff had not actually lost a certain amount of time from work.

The Majority complains because the court below, in ordering a new trial, did not use sufficiently indignant language. The Majority suggests that, in order to assure us that it really meant what it said in ordering a new trial, the trial court should have said that the verdict was "miserly" and "patently insufficient" or that it was "inconsistent and unreasonable," as had been said in other cases. So extraordinary an argument deserves to be replied to with the bromide that "facts speak louder than words." If a man says that he has only ten cents with which to buy a dinner, he does not need to add that he is "dead broke", or if he has only $50 with which to buy a house he does not offer up sky-filling lamentations that he is "filthy poor." If three estimable and experienced judges of the court of common pleas specify that Hansford Elza received only $950 when his proved, undisputed expenses amount to $1960, do these judges need to shout in capital letters, from the courthouse towers, that such a verdict is PATENTLY INSUFFICIENT? Are we now to decide cases on adjectives, adverbs, and colorful rhetoric and not on proved, objective truths? The Majority Opinion, in my opinion, leaves much to be desired in the way of convincingness, but nowhere does it falter so much as it does when it complains because the lower court is modest in its language, even though it speaks

in italics when it states the uncontradicted facts of the case.

Still complaining about the lower court's language, the Majority Opinion says that the trial court did not say that the verdict of the jury was a "travesty of justice," nor did it say it presented a very clear case of "wrong or injustice." And then the Majority observes: "There is nothing in the opinion of the trial court here that reflects such ideas. It speaks only of the case being difficult and says that it 'may well accept either side of the coin.' There should be nothing difficult about a decision to grant a new trial for inadequacy: the injustice of the verdict should stand forth like a beacon."

This observation suggests that the court below was of the view that the equities between the parties were so evenly divided that it could well toss a coin to reach its decision and still be right. But the court said nothing of the kind. A reading of the language employed by the trial court will show that it was very conscientious in reaching its decision. No judge likes to upset the verdict of a jury. Every judge should ponder long and well before taking such drastic action. The trial judge here did so. It would have been an easy matter for the trial judge to have said: "The jury has spoken and why should I interfere?" Thus, one side of the coin spoke of the solemnity and the gravity of a jury's verdict. But there was another side of the coin to consider. That side carried the legend: "Has justice been done?" The trial judge did not toss a coin. After long deliberation and consultation with two other judges, the trial judge concluded that justice could only be served by ordering a new trial.

The Majority Opinion said that in order to award a new trial, the "injustice of the verdict should stand forth like a beacon." A beacon of injustice would

hardly be of much use to mariners seeking an open sea of safety and truth. The lower court was guided, not by the beacon of injustice, but by the beacon of *justice*.

And for this Court to ignore the beams of that beacon is to substitute picayune for precedent, theory for tabulation, and penalty for pain; and, in doing so, to write on the books of the law an illustration of how in straining for gnats, a court can produce a good-sized camel of injustice.

I dissent.