## Alexander v. Knight

*Edward W. Furia*, and *Furia & DiCintio*, for plaintiffs.

*Max E. Cohen* and *Charles L. Ford*, for defendant.

WATERS, J., August 25, 1961.—Defendant has appealed from the order of this court granting a new trial on plaintiffs' motion. This trespass action arose out of an automobile accident which occurred at about 8:30 p.m. on July 26, 1957, in Philadelphia. The jury rendered verdicts in favor of all plaintiffs against defendant in the following amounts: For Vincent Alexander in the sum of $752, which the jury stated represented $25 for his own medical bill and $727 for his wife's medical bills; for Frances Alexander in the sum of $1,000, which the jury stated represented $800 for loss of earnings and $200 for pain and suffering; for Rose Alexander in the sum of $30 and for Michael Alexander in the sum of $25. The parties are referred to by first name for convenience of reference. The new trial was granted because of verdict inadequacy.

At the time of the accident, Vincent was driving his automobile in a northerly direction on Broad Street approaching Allegheny Avenue. His wife, Frances, and his mother, Rose, were in the front seat with him; Frances was seated next to him. Michael was not in the car. Plaintiffs' version of the accident was to the effect that defendant's car struck their car in the rear after they had waited for a traffic light to change; that the collision drove their car forward about 20 to 25 feet. Defendant was also driving his car in a northerly direction with four members of his family in the car. Defendant's version of the accident was to the effect that he was driving about two car lengths behind plaintiffs' car; that the brakes were suddenly jammed on in the Alexander car, and he also applied his brakes and "just slid into him and kissed his bumper with my car." Defendant testified neither car moved after the impact and that neither car was damaged. Plaintiff testified that all that he could see was that the bumper was banged in a little, the trunk was sprung and above the

gas tank it was sprung. After the accident, the police would not move Frances, and they took her directly to the hospital.

Rose Alexander sprained her wrist and hurt her shoulder in the accident. She was treated by Dr. Napoleon for a period of about five weeks. She received heat and electric treatments. She testified that she had pain for about six or seven weeks which decreased with treatment. She lost three days of work as a hand sewer, doing piecework, at which she averaged about $90 per week.

Dr. John Napoleon testified on behalf of Rose Alexander to the effect that he first examined her on July 27, 1957, and found that she suffered shock and trauma to her right shoulder and right wrist. He gave her medication for pain, sedation and diathermy to her shoulder and wrist. He saw her five times, and his bill was $25.

Vincent Alexander, the owner-operator of plaintiff car, was awarded only $25. This was the amount of his medical bill. The *uncontradicted* testimony established that he was treated for injury to his shoulders and back for a period of one month following the accident; that he suffered pain for a period of five or six weeks or a little longer; that he received diathermy treatments. The verdict obviously returned to him only the amount of his medical bill and no allowance was made for pain and suffering. The uncontradicted testimony also established damage to the car in the sum of $233.38, which was paid for by his insurance company. The accident investigation division officers testified that they observed only a small dent on the front bumper of the Knight car and no visible damage or scrapes on the Alexander car. Dr. Napoleon testified that he examined him on July 27, 1957, and found nervousness, pain in the shoulders and the lower spine.

He gave him medication for pain and nervousness and diathermy. He saw him on six occasions and his bill was $25. Finally, the jury allowed nothing to Vincent for loss of consortium, though it is a proper item of damage.

*Immediately* after the accident, Frances Alexander was hospitalized at Temple University Hospital from July 26, 1957, to August 18, 1957, at a cost of $495. At the hospital, she came under the care of Dr. John W. Lachman. She had pain across her shoulders, down her back and down her legs, and was given drugs to alleviate the pain; she had severe headaches. At the hospital, her neck and legs were placed in traction; she was in neck traction for about a week and in leg traction about 22 days. After the neck traction, she was given a neck cast which she wore about six months. After she left the hospital she remained in bed at home for several weeks. After she returned home, she came under the care of Dr. Benjamin Serota. She began wearing a surgical brace, which she was still using at the time of trial. From December 18, 1957, to April 1958, she received physiotherapy treatment which cost $270. On May 4, 1958, she was hospitalized again until May 31, 1958. The second hospital bill was $442.70. She had pain in her lower back and legs and numbness in her left side. At the hospital, a body cast was applied, which she wore for six months.

At the time of the accident, she had been employed in a bookbinding establishment, earning $53.63 per week; she had been so employed for a period of nine years. She was out of work, after the accident, for a period of 16 months.

Dr. Lachman testified that when he first saw Frances on the evening of the accident at the accident dispensary, she complained of pain and stiffness in her neck; she didn't want to move her neck because it hurt,

and she stated that she had been involved in an automobile accident. Objective examination showed stiffness in the neck which she did not move because of pain. She was *that day* placed in neck and bilateral leg traction and given sedation to control pain. A Thomas collar, that is, a plaster-of-paris collar that extended from chin to chest, was placed on her neck. She was instructed on November 6, 1957, to gradually discard the collar, but was still wearing it in December when riding in an automobile. Dr. Lachman stated that plaintiff sustained a whiplash injury as a result of the accident; that in his opinion "the problem which she had of pain and stiffness in her back, pain in her low back, nervousness, was a result of her accident."

After she was discharged on August 18, 1957, he saw her again on October 4th. She still complained of pain and he found about 50 percent limitation of motion and stiffness of the lumbar spine. He described his subsequent treatment up to April 29, 1958, at which time he advised her she would have to be readmitted to the hospital. He described her hospital treatment and subseqeunt post-hospital treatment and stated: "At no time was she ever completely free of pain. And at no time did she ever have completely normal back motion."

On cross-examination, Dr. Lachman testified that the patient's injury was prolonged by emotional problems. He testified that in whiplash cases, emotional problems cause the pain to last longer; but that this did not mean that the pain was not real. He stated there was no question whatsoever but that she had pain. He testified that every time he observed a whiplash injury, it dragged on just as Mrs. Alexander's did; that he felt that doctors have simply not been smart enough to find the cause of the pain in whiplash injury; that "nobody would go through what she has gone through in the

way of treatment if she didn't have pain." Dr. Lachman called in and consulted Dr. Murtagh, a neurosurgeon, Dr. O. Eugene Baum, a psychiatrist, and Dr. Robert Bucher, a general surgeon.

Mr. Joseph Bruno, a physical therapist, testified as to the course of physical therapy which he gave to Frances at Dr. Lachman's instruction, consisting of 54 treatments from December 18, 1957, to April 30, 1958.

Dr. Benjamin Serota also testified on plaintiff's behalf. He was her regular or family physician since 1951. He commenced treating her on August 22, 1957, after her release from the hospital on August 18th. He described her symptoms and history and gave his diagnosis as whiplash injury of the cervico-dorsal area. On cross-examination and upon inspection of the doctor's card, it was elicited that plaintiff was "in another auto accident" and "suffered a whiplash injury of the cervico-dorsal area again," on September 5, 1958, *after* her second hospitalization and two years after the first accident.

Dr. Frederick Murtagh, a neurosurgeon, examined Frances at the request of Dr. Lachman. He testified as to the history elicited and the results of his examination. He concluded that she sustained a moderately severe whiplash injury or musculo-cutaneous injury of the neck and spine; that she had a very pronounced response of the muscles with marked spasm. He also was of the opinion that there was a marked hysterical element present, which was more severe because the patient was basically emotionally unstable. He testified that emotional instability perpetuates the symptoms of a whiplash injury over a long period of time.

Dr. Murtagh testified that he signed a report on April 25, 1960, for a Dr. William J. Ezickson wherein he stated, inter alia: "It is my opinion there was very mild musculo-ligamentous strain at the time of the

accident, but no neurogenic involvement, nothing to suggest a permanent neurologic sequelae, and that the prognosis for recovery of this mild strain should be very good. Her somatic symptoms, meaning the symptoms expressed in the muscles and joints and things, however, have been perpetuated by an underlying pre-existing anxiety neurosis and hysteria, centered about an hysterical personality."

Dr. Ezickson apparently is a physician who is employed by defense attorneys to interview doctors for injured plaintiffs and to secure a report from them. He secured such report from Dr. Murtagh, and he paid Dr. Murtagh $50 for the report. This report was given despite the fact that Dr. Murtagh never received his patient's permission to give such report or information.

We do not consider the entire Ezickson matter as significant in this case, but we deem it advisable to briefly refer to our view of this incident. We are of the opinion that members of a profession, especially the medical profession, stand in a confidential or fiduciary capacity as to their patients. They owe their patients more than just medical care for which payment is exacted; there is a duty of total care; that includes and comprehends a duty to aid the patient in litigation, to render reports when necessary and to attend court when needed. That further includes a duty to refuse affirmative assistance to the patient's antagonist in litigation. The doctor, of course, owes a duty to conscience to speak the truth; he need, however, speak only at the proper time. Dr. Ezickson's role in inducing Dr. Murtagh's breach of his confidential relationship to his own patient is to be, and is, condemned.

Dr. Martin A. Blaker testified on defendant's behalf that he examined Frances at his office on No-

vember 20, 1957. He testified as to the details of the history he elicited and of his examination. His conclusion was that she sustained an acute cervical strain, a stretching-type injury of the muscles and ligaments, and that there was present a chronic lumbosacral strain. Finally, he concluded "that over and above and governing all of these complaints, there is an obvious neurotic trend." He stressed that the neurotic tendency was not produced by the accident. On cross-examination, he did not disagree that plaintiff sustained a whiplash injury.

The parties directed our attention to various decisions bearing upon our function in exercising discretion as to whether a new trial was required. It is, of course, the province of the jury to resolve issues of credibility and it is for the jury to evaluate the total pattern of liability and damages. Where the verdict bears a reasonable relationship to the damages proved and also comprehends the jury's resolution of disputed liability, the court cannot simply substitute its judgment for that of the jury: Elza v. Chovan, 396 Pa. 112 (1959); Paustenbaugh v. Ward Baking Co., 374 Pa. 418 (1953); Carpenelli v. Scranton Bus Co., 350 Pa. 184 (1944); Perzak v. Coulter, 171 Pa. Superior Ct. 475 (1952). The mere fact that a verdict is low does not necessarily mean that it is inadequate: Palmer v. Leader Publishing Co., 7 Pa. Superior Ct. 594 (1898).

As stated in Elza v. Chovan, supra, at page 115: ". . . compromise verdicts are both expected and allowed: Karcesky v. Laria, 382 Pa. 227, 114 A. 2d 150 (1955). The compromise may arise out of damages or negligence or the balance of evidence concerning either or both." See also Patterson v. Palley Mfg. Co., 360 Pa. 259 (1948). However, a verdict is not a proper compromise when it represents a retreat

from the responsibility for decision. The compromise is not a proper one when it derives from misunderstanding, passion, prejudice or any other improper motive or factor. A verdict which arbitrarily allows nothing for pain and suffering, where some pain and suffering must have existed, cannot be permitted to stand. A verdict which arbitrarily ignores established damages without proper necessity or basis for compromise must be set aside. See Krusinski v. Chioda, 394 Pa. 90 (1958); Todd v. Bercini, 371 Pa. 605, 607 (1952); see also Nikisher v. Benninger, 377 Pa. 564 (1954); Takac v. Bamford, 370 Pa. 389 (1952); Snyder v. Nehila, 184 Pa. Superior Ct. 89 (1957); Fabel v. Hazlett, 157 Pa. Superior Ct. 416 (1945); Patterson v. Pittsburgh Railways Company, 136 Pa. Superior Ct. 432 (1939).

In Kiser v. Schlosser, 389 Pa. 131 (1957), Mr. Justice Cohen stated (at page 133):

"True it is that the assaying of the credibility of witnesses and the resolving of conflicts in their testimony are for the jury. But it is equally true that the trial judge may not hide behind the jury's verdict; he has a duty to grant a new trial when he is convinced that the judicial process has resulted in the working of an injustice upon any of the parties."

The verdicts of $30 for Rose and $25 for Vincent were palpably inadequate. They reflected no consideration of pain and suffering and yielded less than the expected cost of simply bringing in Dr. Napoleon to testify as to his bills. The jury obviously either did not understand the court's instructions or was so prejudiced as to refuse to accept the uncontradicted medical evidence offered on their behalf.

The most important aspect of the inadequate verdicts rendered for Rose and Vincent was that it buttresses our conclusion that a new trial must be

granted as to Frances. The jury was admittedly in error in its verdicts as to Rose and Vincent, and we reject the contention that they were "however" correct as to Frances. The award of $200 for her pain and suffering was both calloused and ridiculous. When it is realized that she was *immediately* hospitalized after this accident and *immediately* placed in traction by a strange physician, defendant's pretense that there was hardly any accident at all is not palatable. Whether we consider plaintiffs' medical evidence or defendant's own medical evidence, the $200 award was grossly inadequate. If we consider only the period during which she sustained an earnings loss, according to the jury's own verdict, it encompasses traction experience and pain which the jury necessarily ignored. If it be assumed that the jury limited plaintiff's damages to the period from July 26, 1957, until November 26, 1957, the verdict was still inadequate. Plaintiff's counsel directs our attention to the fact that defendant, an elderly man of over 70 years, sat with his elderly wife, obviously in poor health, in the first row in the courtroom throughout the trial; that the jury could observe his wife use her cane to aid her in walking each day. We need not conjecture as to what improper considerations or thought processes interfered with the jury's discharge of its duties; we are quite satisfied that the jury failed to render an unprejudiced and proper verdict; that it fell victim to some conjectural sawdust thrown into its collective eyes.

Defendant's counsel very ably established the picture of an emotionally disturbed plaintiff whose emotional instability prolonged her illness. It had been shown that she was married at the age of 33 to a younger man about five weeks prior to the accident; that she had difficulty adjusting to married

life; in a word that she was afraid of sex and regarded it as unclean.

Defendant in his brief states: "The pattern finally develops of a neurotic, emotionally disturbed woman who has exaggerated her complaints, permitted her emotional instability to prolong her illness and who subsequent to the accident in question was involved in another automobile accident which injured the same parts of her body." The second accident, in any event, was several years after the first accident. An emotionally ill person does not "permit" prolongation of illness; such illness is real, not feigned.

We are satisfied that the jury in this case was unable to comprehend or refused to comprehend the fact that hysterical symptomatology does not mean feigning or malingering; that hysterically derived pain is quite real to the patient. A defendant is not relieved of responsibility because his victim is of a neurotic predisposition. A jury, in its wisdom, may well be penurious in its award, but we could not permit a jury verdict to stand where it represented an apparent misunderstanding as to the nature and reality of injury prolonged by emotional problems; from such misunderstanding came prejudice and error.

From our consideration of the entire matter we concluded that the grant of a new trial was in the interest of justice.

### Order

April 24, 1961. Plaintiffs' motion for a new trial is sustained.