## Industrial Valley Bank & Trust Co. v. Norman

*C. V. Henry, 3rd,* and *Joseph C. Mesics,* for plaintiff.

*Thomas A. Ehrgood,* for defendants.

GATES, P. J., March 1, 1971.—This is a suit by the Industrial Valley Bank and Trust Company, successor by merger and consolidation to the Security Trust Company of Pottstown, Pa. (hereinafter called "the bank") on a continuing guaranty agreement whereby Samuel K. Norman and his wife, Julia C. Norman, agreed to jointly guarantee all present and future liabilities of Samuel K. Norman, individually, to the

bank up to a limit of $100,000. The bank contends that Samuel K. Norman is in default in the payment of three separate notes to the bank totaling in excess of the amount guaranteed. Therefore, the bank claims damages of $100,000.

Defendants answered the complaint, denying liability under the guaranty agreement, and Samuel K. Norman, individually, counterclaims for losses allegedly sustained by him in banking transactions as a result of the bank's failure to use the reasonable and ordinary care that is customary practice of a banking institution.

The case came on for trial on November 10, 1970, before a jury, resulting in a verdict on November 13, 1970, in favor of the bank and against Samuel K. Norman and Julia C. Norman in the amount of $100,000 and, on the counterclaim, a verdict in favor of Samuel K. Norman and against the bank in the amount of $20,000.

Thereafter, defendants filed a motion for a new trial, alleging that the verdict was against the evidence, the weight of the evidence, the law and the charge of the court. Furthermore, defendants allege that the verdict on the counterclaim was inadequate and against the weight of the evidence. No trial errors are charged.

With one of defendants' contentions, we heartily agree. This is a complicated case. But, if the verdict of the jury finds support in the evidence, the mere fact that it was a difficult case is no reason to grant a new trial. Obviously, the case will be just as thorny for the next jury, if not more so.

Clearly, the weight of the evidence in this case supports the verdict in favor of the bank and against the Normans in the amount of $100,000.

The guaranty agreement, signed by the Normans, upon which suit was brought was introduced into evi-

dence and its execution by defendants never denied. The instrument is complete and regular on its face, with the exception of the blank space provided for the identity of the borrower whose obligations were to be guaranteed by defendants. This fact was supplied by the testimony of the bank officer who handled the transaction. He testified that a previous guaranty agreement had been drawn, identifying Samuel K. Norman as the borrower, and executed by both defendants. This prior guaranty agreement had a ceiling of $250,000. The bank officer explained that he believed this was in excess of the lending limits of the bank and, therefore, drew up the subsequent agreement with a limit of $100,000 to replace it. Both the testimony of the bank officer and the letter sent to the Normans support the contention that the $100,000 guaranty agreement was intended to replace the earlier $250,000 guaranty agreement wherein the identity of the borrower was clearly set forth.

Furthermore, the reason for the guaranty agreement was rationally explained by the bank officer handling the transaction. He testified that Samuel K. Norman was engaged in the buying and selling of cattle. Frequently, Samuel K. Norman would borrow money on his own account for purchases and, on other occasions, he would endorse the notes of buyers of cattle, thereby becoming liable upon default by the purchaser. It was inconvenient to have Mrs. Norman's signature on these various note transactions, and, since the major asset of the Normans was a farm titled in the name of Mrs. Norman, the bank was desirous of having her joinder on the guaranty agreement.

Thus, it is evident that the proof was sufficient to establish that Samuel K. Norman and his wife Julia were liable on the guaranty agreement in the amount of $100,000.

Furthermore, the bank introduced into evidence three notes signed by Samuel K. Norman, individually, in a total amount exceeding the $100,000 liability limit of the guaranty agreement.

The first note was in the amount of $59,500. This was admittedly a consolidation note for direct loans to Samuel K. Norman in the amount of $45,000 and a default note of Joseph Watt in the amount of $14,500 which had been endorsed by Samuel K. Norman.

Defendants' sole assault on this note was their claim that $50,000 of this note had been forgiven by the bank as a result of various disputes between the bank and Samuel K. Norman. In support of defendants' contention, he points to an endorsement on the note of a credit of $50,000. The bank, however, denied forgiving Norman $50,000 of indebtedness as a result of a compromise concerning disputes. The officer in charge of the transaction from the bank testified that the bank examiners directed them to write off $50,000 of this note as a charge against its reserve for bad debts, since it was considered by the examiners as uncollectible. The bank officer testified that this is a common practice required by bank examiners in order to conform the banks asset statement to reality. A bank loan to a customer is carried on the bank's balance sheet as an asset. If the note supporting the loan appears to be uncollectible, the bank examiners direct it be charged against reserve for bad debt and not carried as an asset, thus more accurately reflect the financial condition of the bank. However, this does not, of itself, constitute forgiveness of the debt to the debtor. The obligation continues and is collectible in the future if the debtor is solvent.

At any rate, the contentions were squarely put to the jury, and they evidently resolved it in plaintiff's favor.

The second obligation of Samuel K. Norman which was in default was a note dated June 1, 1964, in the amount of $30,000. The evidence and testimony in support of this note is unchallenged. The money was borrowed by Norman for working capital in connection with the sale of cattle in Mexico. It was the defendants' contention that this money and $20,000 of his own money as well were lost in the Mexican transactions as a result of the bank's negligence in connection with these transactions. This will be treated in more detail when we discuss defendants' counterclaim in this regard. For these purposes, there is no doubt but that Samuel Norman received $30,000 from the bank and signed the note in question, thereby obligating him to repay the money to the bank.

The third note signed by Samuel K. Norman, individually, was dated December 1, 1964, and was in the amount of $39,755.43. Plaintiff's testimony with respect to this note was that at the time it was signed there were a number of outstanding notes which were in default and for which Mr. Norman was liable as a guarantor or endorser. It conceded that there were some direct loans from the bank to customers of Norman for which Norman was not liable as an endorser. At the time, Norman raised numerous questions with regard to handling these notes and as to the amount of interest being charged to him on recourse. As a result of these disputes, Norman agreed to assume liability for the notes listed on a schedule and the bank agreed to reduce the total obligation by $14,000. The evidence indicates that the bank did credit Norman with $14,000, and, when he executed this note, Norman agreed to accept liability for notes totaling $39,755.43, even though at least one of the customer notes was initially without recourse to Norman. This contention finds support not only in the testimony of

the bank officer handling the transaction but in a written agreement and schedule of notes produced at the trial.

All of the contentions in connection with the validity of these notes and the liability of Norman to pay them were submitted to the jury, and they resolved the disputes in favor of the bank. Thus, plaintiff established its entitlement to the maximum amount covered by the guaranty agreement.

We now turn our attention to the counterclaim of Samuel K. Norman.

The first item claimed by Norman is a reserve account being retained by the bank in the amount of $21,406.68, which he claims is due and owing him as a result of past commercial dealings with the bank. However, the evidence is undeniable that this reserve account was created by an agreement between Norman and the bank, and it represents a percentage of the sales made by Norman and financed by the bank and that its purpose is to counterbalance any defaults in these financed transactions. The testimony discloses that there are outstanding active accounts in excess of the amount of the reserve and, therefore, Norman is not entitled to these monies, at least at this time. Furthermore, defendants' brief sets forth no argument in support of this particular claim.

The next item in the counterclaim involves the loss on cattle sold to Joseph Watt. The testimony discloses that Norman made an original sale to Watt of 54 cows which were identified in a filed security agreement by ear tag numbers. Subsequently, Norman sought to obtain additional security. On March 22, 1962, the bank received a list of additional cattle represented by ear tag numbers from Norman. True, Norman denied that the tags were furnished as of this date, but the testimony and the documents covering the note and signed

by Norman do indeed bear that date. The security agreement was filed within seven days thereafter. Watt went into bankruptcy less than four months after the bank received the ear tag numbers. In that the transaction was not a sale but represented additional security for an existing debt, it constituted a preference under the bankruptcy laws and, therefore, it would have been useless to file a reclamation petition for the cattle covered by this document. Clearly, the bank could not have been found negligent by the jury, since they filed the papers shortly after receiving them. There is no evidence that the bank was negligent in failing to obtain the numbers earlier or that it was the bank's responsibility to obtain them. Testimony discloses that the farm in question was located in Fayette County and that it was Norman's responsibility to obtain the list of ear numbers. Certainly, the jury was justified in resolving the controversy in favor of the bank in light of the testimony and especially in view of the date on the note forwarding the ear tag numbers and signed by Norman.

Norman's next claim arises out of the Mexico cattle transaction. Briefly, the arrangement was to sell cattle in Mexico under a Federal government sponsored program insuring these loans on the sales against default. The contract of insurance required that the insurance company be notified of any defaults in order for the coverage to apply. The loans were not serviced by the plaintiff bank but by the First National City Bank of New York. The testimony by plaintiff was to the effect that they did not know, and indeed had no way of knowing, if these loans were in default. The bank further disavowed any connection with these transactions and claimed they were under no obligation to determine if there was a default or notify the insurance company. The bank officer testified that he did assist

Norman in a number of aspects of these transactions such as procuring credit reports and setting up the insurance arrangements and providing for the loans to be serviced by the First National City Bank of New York. But he insisted that the bank had nothing further to do with these accounts. Rather, it was Norman who was obligated to send timely notices of default to the insurance company. Again, there was conflicting testimony by Norman, but these matters depended upon the credibility of the witnesses in most cases and were for the proper submission to a jury. That the jury apparently adopted plaintiff's version has support in the evidence and cannot be characterized as being against the evidence or its weight.

We have already discussed the item in the counterclaim with regard to the note of $39,755.43. In summary, the customer notes totaling this amount, whether initially recourse or nonrecourse, was immaterial if the jury found, as it certainly could have, that this note was the product of a compromise agreement concerning numerous other disputes, resulting in a $14,000 credit given by the bank to Norman.

At trial, Norman amended his counterclaim to include the additional sum of $233.89, representing the balance in his account in plaintiff bank which the bank closed out and credited against his existing obligations at the bank. It is difficult to understand the theory of this contention, since it is admitted that the bank has credited Norman's accounts with this amount.

One more matter deserves our attention. Norman contends that he is unable to relate the $20,000 verdict in his favor to any of his specific claims, and, therefore, he argues that the verdict is irreconcilable and a reflection of confusion on the part of the jury justifying the award of a new trial.

Most of Norman's counterclaim is based on an allegation that the bank was negligent in handling various transactions on his behalf. On the other hand, the bank denied that they were in any way negligent or responsible for the losses Norman sustained. It is impossible from the verdict slip to determine which of the various claims Norman espouses resulted in a verdict in his favor for $20,000. But Norman's testimony itself is, in part, to blame. In referring to the Watt transaction resulting in a bankruptcy proceeding and a loss to Norman because of the alleged failure of the bank to timely file the security agreements, the following testimony is pertinent but not very helpful or clear:

"Q  As a result, sir, can you indicate whether or not you suffered any loss on this loan?

"A  I would say *between 20 and 30 thousand dollars*, somewhere in there . . ." (Italics supplied.)

Furthermore, in connection with the Watt transaction, Norman testified that the original 54 head of cattle sold to Watt and covered by a properly filed security agreement were recovered on a reclamation petition in the bankruptcy proceeding. However, he claimed that there were 50 head of cattle in addition which he lost as a result of the bank's failure to record the security agreement on time. In referring to the value of these 50 head, the following testimony again is pertinent but certainly not clear:

"Q  Now, by the way, what was the value of these, what type of cattle were they?

"A  I think at that time they were *between four hundred and five hundred dollars*, I just forget the time. If I had the folder I could look and tell you exactly. But I would say *from four to five hundred.* It seems to run in my mind these were $450." (Italics supplied.)

It is not beyond the realm of speculation that the jury decided to compensate Norman for his loss in this particular transaction. In view of the vagueness of his estimate as to damages, there is nothing wrong in the jury's accepting his lowest estimate of $20,000 or computing his loss by multiplying the number of cattle lost (50) by his lowest estimate of their value ($400).

The only other area of testimony where the sum of $20,000 was mentioned was in connection with the Mexican transaction. Norman testified that he borrowed $30,000 from the bank for working capital in the Mexican venture. He testified that he lost that money and "Then I lost *about roughly $20,000* of my own money." (Italics supplied.)

It is evident that we cannot from the verdict slip itself determine precisely how the jury arrived at its award of $20,000 to Norman on his counterclaim. Suffice it to say that it is not irreconcilable with the testimony, for the fact is that there is more than one basis upon which the jury could have found in his favor in that amount. Furthermore, in negligence cases, there is no magic in amounts but only in the circumstances, and compromise verdicts are both expected and allowed: Karcesky v. Laria, 382 Pa. 227. The compromise may arise out of the nature of the proof of damages in connection with the circumstances surrounding the alleged negligence, or it may be the result of the balance of evidence concerning either or both. Under circumstances such as this the grant of a new trial may be an injustice to the defendant on the counterclaim rather than an act of justice to the plaintiff. See Patterson v. Palley Manufacturing Company, 360 Pa. 259; Elza v. Chovan, 396 Pa. 112.

In conclusion, we agree with defendant that whenever it appears with reasonable certainty that actual and manifest injustice has been done or that the jury

has proceeded on an evident mistake either in point of law or fact or contrary to strong evidence a new trial should be awarded. We heartily endorse this principle. But this case does not demonstrate a manifest injustice nor is there an indication that the jury was mistaken about anything. The jury heard three days of testimony, argument and charge; they had to examine 21 exhibits submitted by plaintiffs and 24 submitted by defendants. The jury's verdict for plaintiff is in the precise amount claimed by plaintiffs. The verdict on the counterclaim can be found to be based upon the evidence, or it can be the product of a compromise.

We close as we opened with the observation that this was indeed a difficult case, but it will not be any easier for another jury. We are not persuaded that a new trial should be awarded.

Therefore, after careful consideration we will make the following

## ORDER

And now, to wit, March 1, 1971, defendants' motion for a new trial is refused, and the clerk of court is directed to enter judgment on the verdict of the jury.