## Daugherty *v.* Erie Railroad Company, Appellant.

Argued March 16, 1961. Before JONES, C. J., BELL, MUSMANNO, JONES, COHEN, BOK and EAGEN, JJ.

*Fred C. Kiebort*, with him *T. A. Sampson, Jr.*, and *Sampson and Sampson*, and *Humes and Kiebort*, for defendant railroad, appellant.

*George Hardy Rowley*, with him *Voorhies, Dilley, Keck & Rowley*, for individual defendant, appellant.

*Cyril T. Garvey*, with him *Evans and Garvey*, for plaintiff, appellee.

OPINION BY MR. JUSTICE MUSMANNO, April 17, 1961:

Ellis L. Daugherty was a passenger in an automobile being operated by Norma Lee Novak over the Clark Street Crossing in Sharon, which crossing was blocked by a stationary railroad car of the Erie Rail-

road Company. The automobile collided with the railroad car and Ellis Daugherty was seriously injured. He brought a suit in trespass against the Erie Railroad Company and Miss Novak.

The jury returned a verdict in his favor against both defendants in the amount of $9,500. The plaintiff moved for a new trial on the ground of inadequacy of the verdict. The motion was granted, the court restricting the new trial to a question of damages alone.

Both defendants appealed contending that the verdict is adequate and that in any event if a new trial is to be had it must be a general one including the question of liability.

One cannot read the record in this case without agreeing with the trial judge who said that the verdict was "so inadequate as to be patently unjust."

When Miss Novak's automobile struck the railroad car the plaintiff was thrown with extreme violence against the dashboard of the automobile. He sustained a dislocated shoulder and suffered injuries to his right leg and ankle and right wrist. His most serious injuries, however, occurred in and about his face and head. The lower court described these injuries in the following language: "The floor of the orbit of the left eye was fractured, his nose was smashed, and both the upper and lower jaws were broken in numerous places. When Dr. Sass, who treated him in the emergency room at the hospital, pulled on the plaintiff's teeth to see if his upper jaw was broken, the entire front portion of his face dropped down. The doctor testified that compound fractures of the nose protruded through the mucous membrane into the nose itself. The X-ray discloses that the plaintiff sustained multiple fractures of the left cheekbone. The cribiform plate at the base of the nose which houses the olfactory nerve was injured. As a result the plaintiff sustained the loss of the senses of taste and smell.

"Dr. Camp, the oral surgeon who treated the plaintiff, in describing the fracture of the upper jaw, testified that it extended from the wisdom teeth on the one side to the wisdom teeth on the other and that one could move the upper jaw from side to side or up and down, since the fracture had completely severed the jaw from the rest of the skull.

"The oral surgery lasted about three and one half hours. In the operation the doctor cut the tissue below the teeth along the entire lower jaw, realigned the jaw and inserted a wire under the tissues to hold the fractures in place. The wire will remain permanently in the plaintiff's face. The doctor then fastened a splint which was wired to every tooth and applied a head cast in order to maintain tension and keep the lower jaw in place. The splints in the lower jaw were fastened to the head cast by means of wires which came out through the plaintiff's cheeks. The plaintiff was required to wear this head cast for a period of about two months after he was discharged from the hospital and while he undertook to attend to his work. During this time, he was on a liquid diet since his jaws were immobilized. X-rays taken subsequently disclosed that much of the bone in the area of the fractures was destroyed. Dr. Camp testified that the teeth in the upper and lower right jaw will have to be removed as a result of the injuries and that within two or three years the plaintiff will lose all of his teeth.

"Dr. Murray was the surgeon who operated on the plaintiff for the purpose of restoring the latter's left eye bone to its normal position. He described this operation as consisting of an incision beneath the eye and the fastening of a polyethylene plate under the eye to serve as a floor on which the eyeball would rest. This plate was wired to the floor of the orbit and it is a permanent installation. While one of the purposes of the operation was to improve the plaintiff's appearance

and vision, Dr. Murray testified that the plaintiff's face is still asymmetric and that the double vision that he still experiences in the upper field of his vision cannot be improved. Dr. Murray later performed a second operation for the purpose of minimizing the disfigurement which resulted from the oral surgery when wires traveled through the cheeks to hold the lower jaw in position by means of the headcast. As a result of this accident the plaintiff's face is disfigured to the extent that former acquaintances testified that they did not recognize him. One side of his face is caved in and the shape of his whole head is altered."

That these various operations and treatment were all accompanied by pain, often of the most excruciating character, must be evident from the mere reading of the judge's account of what happened. In addition, the record shows that, to deaden pain the patient was administered narcotics, principally morphine and demerol.

The plaintiff's occupation is that of a certified public accountant and, at the time of the accident, he held the office of city treasurer of Sharon with a salary of $5,000 a year. Contending that the verdict was adequate, the defendants argue: "He sustained no loss of his salary of $5,000 per year by reason of the accident . . . There was no evidence of impairment of his earning power."

The lack of diminution in salary is no criterion for determining the impairment of earning power. There may be many reasons why a person's salary remains constant, which reasons in no way establish that he can perform his work as capably as before the accident. An employer may continue to pay the same salary to a disabled employee out of sympathy for the employee's misfortune. There may even be a contractual arrangement guaranteeing the continuation of salary regardless of impairment of earning power. Moreover, in our

highly competitive and progressive life, regardless of occupation involved, constancy in wages or salary may in itself be evidence of impairment of earning power because the norm in the scheme of any wholesomely ambitious person is to increase one's salary as time goes on. Not to be promoted in position and salary may be evidence of retrogression. Any way, the question of salary insofar as the verdict in this case is concerned is not the most important item.

One of the heaviest losses sustained by the plaintiff is that of disfigurement. The defendants do not even discuss in their brief this catastrophic loss inflicted on the plaintiff. We have seen that the trial judge said that one side of the plaintiff's face is "caved in" and the "shape of his whole head is altered". People who have known the plaintiff for years now pass him on the street without recognizing him. Persons who knew him from boyhood were unable to reconcile the plaintiff's present appearance with the way they had known him in the past.

For any person in public life a good appearance is an invaluable asset. To destroy that good appearance is to destroy one of the greatest treasures a person may possess.

In these days of extensive pictorial reproduction through portraits, sketches, photographs, motion pictures and television, a photogenic personality counts for more than can be estimated in dollars and cents. However, difficulty in computation should not deprive the victim of a disfiguring accident from an approximate recompense for what he loses through a crippling of his public personality.

As a certified public accountant the plaintiff may also have lost and may continue to lose revenue which he cannot compute because he has no way of knowing what persons have failed to engage him and may con-

tinue not to engage him out of embarrassment on account of his changed appearance.

The appellants also fail to comment on another very serious impairment sustained by the plaintiff,—his loss of the senses of taste and smell. One does not need to be a gourmand or gourmet to conclude that the consumption of food and drink represents a not inconsiderable portion of man's enjoyment of life. To be deprived of the capacity to enjoy flavorful dishes and palatable beverages is to be robbed of much of what goes into a rewarding existence because, with the "inner man" satisfied, one can work with greater zest in the accomplishment of his chosen tasks and in making his contribution to the happiness of those dependent upon him and mankind in general. The defendant has lost much of the desire for the table because he can detect no difference in food. Whether it be the rarest delicacies or the commonest kind of provender which he eats, he tastes only sawdust. He testified: "I have no taste or smell. I mean, when I'm eating a piece of cake or a steak, or something like that, I didn't have any taste. A piece of steak or a piece of beef, or something like that, tastes like a piece of wood, or sawdust."

When asked whether he could distinguish by taste the difference between pies, he replied: "No, not by taste I couldn't tell. I know that pie, when it's real sweet, it gets down in the recession of my gums, I get the sensation from it. But as far as tasting it, I can't tell the difference between a cherry pie or apple pie, or anything like that."

As to his teeth (as long as he retains what are left) he testified: "Q. Have you any sensation in your teeth, the front teeth at all? A. I have that numbness, no feeling, limp feeling—just like you were hitting a key on the piano. Q. When you bite on something, can you tell the feeling in your teeth, whether you were biting hard, whether you were making a hard bite on

something? A. No, I notice, when I eat—I notice it on a hot dog, that's the one thing that I really tried to bite, and I don't have any idea how much pressure I'm putting on, on the hot dog, or how far I am biting through it, I mean. I just don't feel it the way that I should."

Another grave result of the accident was the injury done to the plaintiff's eyes. In spite of the optical operations he has undergone he still experiences double vision when he looks above the horizontal. Dr. Richard D. Murray testified that this distressing symptom would probably be permanent.

The defendants argue that regardless of the nature of the verdict it may not be condemned unless it can be shown that the jury was influenced by "partiality, passion or prejudice". There are many reasons why a jury may err without being accused of misconduct. It could be that a jury, wholly honest and trustworthy, could be misled by a judge's charge. In *Fitzgerald v. Penn Transit Company,* 353 Pa. 43, this court ordered a new trial on the grounds of inadequacy of verdict and said: "This is not a case in which plaintiff was negligent and a verdict could properly be rendered for defendants. Here the jury found the accident was caused by both defendants, not contributed to by plaintiff, and therefore from both, plaintiff should get adequate damages."

And that brings us to the remaining question to be considered, namely: Was it proper for the lower court to order a new trial limited only to the ascertainment of proper damages? The appellants contend that the court erred in this respect.

No purpose would be served in retrying the question of liability in this litigation. The defendant Norma Lee Novak offered no explanation as to why she drove her automobile into the railroad car standing motionlessly athwart her path of travel. The railroad com-

pany offered no explanation as to why it violated the Act of March 20, 1845, P. L. 191; 1911, June 9, P. L. 726; 67 PS §452 which prohibits the blocking of public streets with locomotives or railroad cars.

Neither defendant has asked for a new trial on the basis of non-negligence or trial error. Nor has either defendant suggested that new or additional evidence could be presented on the subject of liability. The question of liability, as might be true in some cases, is not so intertwined here with the question of damages as to justify a new trial generally. The very opposite is true. A new trial on liability would be a repetition of what has been fairly, completely and decisively adjudicated against the defendants. A new trial on liability would be a wholly empty procedure. It would be a dress rehearsal of a play which has closed.

What was said by the Superior Court in the case of *Cason v. Smith,* 188 Pa. Superior Ct. 376, would well apply to the case at bar: "We have recognized that, where the question of liability has been fairly determined and defendant makes no complaint in respect thereto, it is not improper to eliminate the issue of negligence from further consideration by the jury at the new trial . . . In this case defendant's negligence was fairly determined and fully established by the evidence. Defendant makes no complaint of any trial errors affecting the matter of liability. In fact, defendant made no request for a new trial. We may assume, since defendant does not suggest otherwise and the contrary does not appear, that the issue of liability was tried without error . . . Viewing the trial as a whole, and considering all the evidence and circumstances, it is also apparent that the negligence on the part of defendant was substantively established with little room for doubt. . . .

"Under all the circumstances, we cannot say that the court below manifestly or grossly abused its dis-

cretion in eliminating the issue of defendant's negligence from further consideration at the new trial."
Affirmed.