**Behrendt v. GAF Corp.**

*William D. Poland, Jr.,* for plaintiff.

*W. Matthew Reber* and *Barbara J. Buba,* for defendants GAF, National Gypsum and United States Gypsum.

DOWLING, *J.*, July 7, 1993—This case revolves around the issue of whether a jury award, which was unconscionably low, can be accepted as a "compromise verdict."

An odd term—compromise verdict—somewhat oxymoronic in that jurors are not settlers or compromisers, but fact finders and law followers. To speak of a jury compromise is akin to referring to a mandatory option or asking for jumbo shrimp or calling a boxer a light heavyweight.[1]

The origin of this incongruous oddity is apparently shrouded in historical smog whose murky layers our admittedly limited research has been unable to penetrate.

The first occasion which we found when the doctrine was permitted in Pennsylvania is *Karcesky v. Laria*, 382 Pa. 227, 114 A.2d 150 (1955), where the author, Justice Bell, states: "[A] trial judge has the power to uphold the time-honored right of a jury to render a compromise verdict...." 382 Pa. at 325, 114 A.2d at 154. Unfortunately, the venerable jurist cites no authority, nor gives any hint as to when "time" began to honor such a precept. Nor does he take note of the fact that it is flatly contrary to a long line of Pennsylvania cases. See *Weir v. Haverford Elec. Light Co.*, 221 Pa. 611, 70 A. 874 (1908); *Oil City Fuel Supply Co. v. Boundy*, 122 Pa. 449, 15 A. 865 (1888); *Monongahela City v. Fischer*, 111 Pa. 9, 2 A. 87 (1885).

Climbing at some risk to our top shelf, we dusted off 92 Pa. where, in *Boden v. Irwin*, page 346, we found the following interesting statement:

"The portions of the charge complained of, were not inaccurate as applied to the facts. But in a subsequent portion of it, the learned judge told the jury: 'The court

---

1. Among our favorites are: original print, military intelligence, payless payday, public defender, dressed nakedness, transparent cover-up, Christian soldier, amateur prostitute, athletic scholarship.

would not set aside your verdict even if you compromise between them... You may compromise the verdict.' This was error. Juries are prone enough to disregard the evidence, and set up their own standard of right between the parties, without a permission to do so from the court. The instruction complained of, left the jury to do as they pleased without regard to the evidence. The verdict was for $62. The extent of the plaintiff's claim was $93.75. What the verdict would have been without the instruction referred to, we have no means of knowing. As, however, it may have influenced the jury, we must send the case back for another trial."

In *Feldman's Pennsylvania Trial Guide* (2nd rev. ed.) §12.14, we find the following:

"It is error for the court to instruct a jury that it should not reach a compromise verdict, but it is also error for the court to instruct the jury that it may reach a compromise."

Interesting!

The learned and beloved Judge Robert Woodside, in two Superior Court decisions, post-*Karcesky,* discusses some of the reasoning behind the acceptance of the doctrine but does not enlighten us as to its origin. He states in *Hilscher v. Ickinger,* 194 Pa. Super. 237, 166 A.2d 678 (1960):

"Whenever there is substantial doubt as to the liability of the defendants, there can be a compromise verdict. A doubt concerning liability, which necessitated a reargument in this court, supports an inference that the jury, too, entertained substantial doubts concerning the defendants' liability.

"The efficacy of the jury system is that it recognized the grays which the law too frequently assigns to the limited categories of black and white. Jurors have a tendency to view the evidence as a whole and to apply to it their accumulated experience and combined sense of justice to arrive at a result they believe to be fair to all the parties under all the circumstances."

In *Friedman v. Matovich,* 191 Pa. Super. 275, 279, 280, 156 A.2d 608 (1959), the judge further elaborates:

"Ordinarily a jury does not apply with meticulous care a logician's syllogism to the evidence nor proceed from point to point in the fashion of a lawyer. It is unrealistic to assume that the judge's charge, filled with technical rules for the jury to follow in arriving at its verdict, is never dimmed in the jury room by the guiding light of a layman's sense. The jury seldom examines the evidence piecemeal with the discerning eye of a scientist, nor does it climb a logical ladder, step by step to a mathematically perfect conclusion. Jurors are more likely to view the evidence as a whole and apply their accumulated experience and combined sense of justice to arrive at a result they think fair to all the parties under all the circumstances. This is not a fault but a virtue of the jury system; it is one of the system's blessings, not one of its evils. This humanizes and tempers the cold logic which accepts no compromises and recognizes no grays. That the jury requires court supervision and its product occasionally requires judicial revision does not detract from the value of this ancient right of free people to have their disputes submitted to their peers. If the jury took a panoramic view of this case to determine the result it believed just, then limiting the retrial to a single point is unlikely to bring about a just result."

Nor do we find any help from other jurisdictions. In fact, most of the cases, although admittedly of some vintage, appear to reject the doctrine. Thus, in *Simmons v. Fish,* 210 Mass. 563, 97 N.E. 102 (1912), one of the more esteemed Supreme Courts states:

"It is urged that this was a compromise verdict, where certain jurors must have conceded their conscientious belief that the defendant ought to prevail to the end that agreement might be reached. In order to pass upon the soundness of this argument, it becomes necessary to inquire what a compromise verdict is, and to ascertain

whether this was such a verdict. It was said by Cooley, *J.*, in *Goodsell v. Seeley*, 46 Mich. 623, at page 628, 10 N.W. 44, at page 46 (41 Am. Rep. 183): 'It is no doubt true that juries often compromise ... and that by splitting differences they sometimes return verdicts with which the judgment of not one of them is satisfied. But this is an abuse. The law contemplates that they shall, by their discussions, harmonize their views, if possible, but not that they shall compromise, divide and yield for the mere purpose of an agreement. The sentiment or notion which permits this tends to bring jury trial into discredit, and to convert it into a lottery.' "

In 95 A.L.R. 944, it states:

"If, from the inadequacy of the damages awarded, in view of the evidence on the subject, or the conflict or the evidence upon the question of liability, or from other circumstances, the plain inference may be drawn that the verdict is the result of a compromise, such error taints the entire verdict, and a new trial should be ordered upon all issues," citing a dozen or so cases from various states.

We are not for a moment suggesting that Pennsylvania does not firmly adhere to the doctrine. To the contrary, they seem to passionately embrace it. See *Elza v. Chovan*, 396 Pa. 112, 152 A.2d 238 (1964); *Deitrick v. Karnes*, 329 Pa. Super. 372, 478 A.2d 835 (1984); *Guidry v. Johns-Manville Corp.*, 410 Pa. Super. 486, 600 A.2d 558 (1991). At the same time we respectfully question its legal soundness. It seems to have been borne full bloom, like Venus's birth from the sea as depicted in Botticelli's famous painting. We have browsed through *Blackstone, Pollock, Maitland, Wigmore, Homes,* and *Frank,* but have found no discussion of the doctrine.

The problem is that a compromise verdict runs directly contrary to the function of a jury and, of course, is against the court's charge in any particular case, i.e., if you find the facts to be so-and-so, you will then apply the law and award full and just compensation. In effect, it gives

the jury the "right" to disregard the court's instructions and settle a case on their own terms.

We faced a somewhat similar problem some years ago in the criminal justice field. The law had been that in a murder case the judge had to instruct the jury on their right to return a verdict of manslaughter, even though the facts in no way suggested such a finding. In *Commonwealth v. Toledo,* 107 Dauphin Rep. 17 (1986), we were able to point out that recent Supreme Court cases no longer supported this position. Our refusal to so charge was upheld by the Superior Court. See *Commonwealth v. Toledo,* 365 Pa. Super. 224, 529 A.2d 480 (1987), *alloc. den.,* 538 A.2d 876 (1988). We said in *Toledo,* "After all the jurors do swear to 'a true verdict rendered according to the evidence.' " As Shylock exclaimed in *The Merchant of Venice:*

An oath, an oath, I have an oath in heaven:

Shall I lay perjury on my soul.[2]

In the instant case, we instructed the jury that if their answers to Interrogatories 1 and 2 concerning liability were in the affirmative, then they were to award full damages to the plaintiff. It is evident from reading the tone and content of the charge on damages that the jury was told that if liability was found, the plaintiff was to be made whole.

Now to the immediate concern as to whether or not a new trial is in order and, if so, on what issues.

First, the procedural history. This action was initiated by the filing of a complaint on August 13, 1991 by Otto E. Behrendt and June A. Behrendt, his wife. Mr. Behrendt died on October 9, 1991, and subsequently his wife was issued letters testamentary as executrix of her husband's estate and substituted as a party in place of the decedent.

---

2. Act 4, scene 1.

The complaint named 17 corporate entities as defendants to alleging that Otto E. Behrendt, through his occupation as a bricklayer from the late 1940s until the late 1980s, had been exposed to dust from asbestos-containing products of the various defendants. As a result, it was alleged that Mr. Behrendt had contracted a form of cancer called mesothelioma.

Prior to the trial of the case, the plaintiff conceded to the entry of summary judgment in favor of 13 of the defendants—all on the basis of a lack of sufficient identification of those defendants' asbestos-containing products—and the case proceeded to trial against four defendants: GAF Corporation, National Gypsum Company, Owens Corning Fiberglas Corporation, and United States Gypsum Company.

The case was tried to a jury from June 1 to 5, 1992, solely on the theory of strict liability; the negligence count and the prayer for punitive damages were severed from the trial, as is the practice in asbestos litigation in this court. On June 5, 1992, the jurors returned a unanimous verdict in favor of the plaintiff and awarded damages of $65,000 to the estate of Mr. Behrendt and $5,000 to June Behrendt for loss of consortium. All four defendants—GAF, National Gypsum, Owens Corning, and United States Gypsum—were found liable. Mr. Behrendt timely filed a motion for post-trial relief seeking a new trial limited to the issue of damages or, in the alternative, a new trial as to liability and damages. The basis of the motion was that the awards of damages were grossly inadequate.

Much of the testimony was uncontradicted, except on causation, and disclosed the following: Otto E. Behrendt was born August 12, 1924 and died on October 9, 1991. He and June were married on October 9, 1945 and had five children, who at the time of trial ranged in age from 33 to 43. Mr. Behrendt worked as a bricklayer from 1947 until 1989, when he reached 65.

Through his bricklaying career, he worked on numerous industrial, commercial and residential job sites around other construction tradesmen who were using various asbestos-containing products. Mr. Behrendt testified by deposition that he regularly worked around dust created by (National Gypsum) Gold Bond, United States Gypsum, and (GAF) Ruberoid Calsilite products. Throughout his bricklaying career, Mr. Behrendt never saw any warning labels on any products concerning hazards related to breathing asbestos. If there had been such warnings brought to his attention, he would not have worked with such products. In December 1990, Mr. Behrendt began experiencing chest pain. Prior to the first symptoms of chest pain in December 1990, Mr. Behrendt had been a healthy person, had never been hospitalized; and was not on medication for any condition. After his retirement in 1989 at age 65, he remained very active. He reconstructed a bathroom, remodeled the kitchen and another bathroom, took care of the yard, and helped remodel the homes of three of his children. Mr. Behrendt was a father-figure to his grandson, Oliver, who was age 12 at the time of trial. Oliver's father left the scene shortly after the child was born in 1980, and Oliver lived with his mother at the Behrendt home from the time he was one year old. Mr. Behrendt and Oliver were constantly together—going to ball games and air shows, fishing, woodworking.

Mr. Behrendt's pain symptoms eventually led to a diagnosis of mesothelioma in December 1990. He was taken to the Emergency Room at Community General Osteopathic Hospital, Harrisburg, on December 23, 1990 with a "constant" pain which he rated, in severity, as a "5" on a scale of 1 to 10. In the months that followed, he underwent numerous tests and surgical procedures which eventually led to a diagnosis of asbestosis and mesothelioma. From that time until his death more than nine months later, the severity of the pain never got better and, in fact, continually worsened.

In her testimony, Mrs. Behrendt described, month-by-month, how her husband's pain persisted and increased from December 1990 until his death in October 1991. In February 1991 at his son's wedding in Michigan, Mr. Behrendt could only lay around in his hotel room; pain medication was begun in February; in March Mrs. Behrendt could not even touch her husband's chest because of the pain; in April the effects of the medication wore off before the next dose was due and the doctors "kept moving him on to something stronger" (N.T. 33-23); in May the pain was still constant and Mr. Behrendt described his chest as feeling like it was vibrating; in June he lost his immune system and had to have a bone marrow biopsy; he didn't sleep well, and in a one-month period lost 15 pounds. By August, Mr. Behrendt was being administered morphine intravenously and orally by pill. The dosage of morphine was continually being increased.

The occurrence of the pain was explained medically by Isidore Mihalakis, M.D., who performed an autopsy on Mr. Behrendt. Dr. Mihalakis testified:

"*Q:* Now, Doctor, there has been some testimony about—that Mr. Behrendt had pain or discomfort in his heart.

"Is there anything in this picture of the heart which correlates anatomically to that complaint?

"*A:* Yes, there is. The heart has fibers, has nerve fibers in it. These have become irritated. And furthermore, they are even more irritated because of these shaggy adhesions between the sac and the heart itself. And every time the heart beats it tugs on these adhesions. And by so doing, it stimulates the nerve endings, and as it stimulates the nerve endings, we have the sensation of pain. It would not be unusual that this person may have had a quote, work up, unquote, for a heart problem.

"*Q:* Those adhesions, would they cause pain every time the heart beats?

"*A:* Because—to a lesser or variable degree. Once it's broken, it causes less pain. Then you have another one form. Then you have the tumor itself which is noted on the heart wall. So the actual heart itself was being invaded by tumor." (Mihalakis N.T. 33, June 2, 1992.)

"*Q:* I noted in your report you had said the lung was compressed. Could you explain that?

"*A:* Well, we have this space here which is filled up with all the scarring material. And eventually, you know, there's compression. Yes, And what you are seeing here is the chest wall.

"*Q:* What kind of symptoms would that sort of compression result in, in a human being?

"*A:* It makes breathing a more tiring process. It causes shortness of breath. And it may cause chest pain, especially in the process of the formation. Once it's already formed and it's plastered up against the chest there's not too much chest—but there is a shortness of breath because lung tissue has been destroyed. The breathing space that the lung tissue affords has been decreased. As a consequence, the endurance and the stamina is [sic] very markedly reduced." (Mihalakis N.T. 36-37.)

Throughout his nine-month ordeal, Mr. Behrendt underwent numerous testing and surgical procedures, including EKG's, CT scans, brochoscopies, bronchial brushing, colonoscopy, esophagogastroduodenoscopy, mini-thoracotomy with biopsy, and thoracentesis. All of Mrs. Behrendt's descriptions of her husband's condition were corroborated by the medical records from

Mr. Behrendt's doctors and Community General Osteopathic Hospital.

In addition to the physical pain and suffering, Mr. Behrendt experienced mental anguish and suffering. In the beginning of February 1991, he went to his then-family doctor, Thomas Trosko, D.O., to try to find out what was wrong with him. Dr. Trosko told Mr. and Mrs. Behrendt that he had asbestosis and was "going to die and have a horrible death." (June Behrendt N.T. 25; Pamela Skelton N.T. 52.) In July, Mr. and Mrs. Behrendt had a meeting with oncologist Scott Barnes, who told them that he had mesothelioma "and there's nothing they can do for him." (June Behrendt N.T. 37.)

Mr. Behrendt's cancer wasted his body physically. The jury was shown photographs of him from October 1990, when he had no symptoms and felt fine, and February 1991, when he went to Michigan for his son's wedding. At the wedding, Mr. Behrendt's daughter Pam "couldn't take [her] eyes off him. Every time I looked at him I could have cried." (Pamela Skelton N.T. 53.)

His condition was an embarrassment to Mr. Behrendt. In August he was "bones and skin." So he wouldn't have to see what he looked like, Mrs. Behrendt took the mirror out of her husband's bedroom. He didn't want other people to see how he looked either, so he told his wife to tell visitors that he was sleeping.

His illness likewise took away all the activities Mr. Behrendt loved to do. He was unable to enjoy his son's wedding; he couldn't play golf or go fishing; he couldn't go to his grandson's ball games; he couldn't ride in a car because it was too painful to sit for very long; and he couldn't enjoy his birthday or his wedding anniversary. In addition, he no longer could socialize

with his family, which he had always enjoyed; he didn't get to travel as he planned; and he couldn't even enjoy sitting on his back porch with a cup of coffee and talking with his wife.

Actual damages documented by the evidence at trial included medical expenses of $61,004.65 and funeral costs of $2,969. In addition, income to the household—via Mr. Behrendt's pension and Social Security payments—was $800 per month (or $9,600 per year) less as a result of Mr. Behrendt's death. Moreover, Mr. Behrendt had intended to do bricklaying work on the side during retirement to earn extra money, and such work was available. He was eligible to earn about $10,000 per year without a reduction in his Social Security payments.

At the time of his death at age 67, the average life expectancy for all other males in the United States of the same age and race was 13 more years. (Life Tables of the U.S. Department of Health and Human Services, read to the jury.)

There also was substantial evidence presented as to the loss of consortium suffered by Mrs. Behrendt. Throughout her husband's nine-month battle with terminal cancer, Mrs. Behrendt cared for him at their home. One of the Behrendts' daughters testified:

"She [Mrs. Behrendt] never left his side, but I can only remember one time when she went to get her hair permed that I sat with him. She just stayed by his side.

"She would have Debby (another daughter) do her grocery shopping to get prescriptions and stuff. She just never really left his side. The [H]ospice wanted to come in. She told them, no. As long as she was able, she would take care of him. She didn't want them because she thought it would upset him. She

would just take care of him." (Pamela Skelton N.T. 59.)

The continuous care, not surprisingly, left Mrs. Behrendt exhausted.

The plaintiff presented two expert witnesses in the field of pathology. Both testified to a reasonable degree of medical certainty that Mr. Behrendt had mesothelioma which was caused by his prior asbestos exposure. The defendants presented an expert in pathology who testified to a reasonable degree of medical certainty that Mr. Behrendt had a cancer of the thyroid gland which had no connection to asbestos.

The difference of opinion between Drs. Gabrielson and Mihalakis for the plaintiff and Dr. Demopoulos for the defendants was stark. Dr. Mihalakis, who performed the autopsy, explained to the jury how the massive spreading tumor wrapped around and squeezed Mr. Behrendt's lung and heart and even extended into the neck area where it invaded the thyroid gland.

Both Dr. Mihalakis and Dr. Gabrielson were unequivocal in their conclusions and opinions that Mr. Behrendt suffered from and died of mesothelioma. Dr. Mihalakis testified, "[t]he cause of Mr. Behrendt's death is asbestosis with mesothelioma and the consequences thereof...," and, "[n]o way do I believe this is thyroid cancer." (Mihalakis N.T. 42.) He elaborated on cross-examination: "But the massive amount (of tumor) is so classic for mesothelioma, you know, one would have to have blinders on to miss the forest for the trees so-to-speak." (Mihalakis N.T. 44.)

Dr. Gabrielson testified similarly, "I don't think there's any chance that it's a thyroid cancer." (Gabrielson N.T. 27.) "I mean this to me is a very straightforward indication, mesothelioma.... The difference between a mesothelioma (and) thyroid cancer is like the

difference between a Chevrolet and a penguin. There's no comparison here. And I just find that a very difficult diagnosis to even consider." (Gabrielson N.T. 59.)

The defense position, as presented by Dr. Demopoulos, was 180 degrees opposite. According to him, there was only a one in 10,000 chance that Mr. Behrendt's tumor was mesothelioma. The defense expert was less certain, however, about being sure it was a thyroid carcinoma. "I think it was most probably a thyroid carcinoma of the anaplastic variety." (Demopoulos N.T. 48.) "I think you have to say that it was probably the thyroid cancer." (Demopoulos N.T. 57.)

The standard governing the granting of a new trial was summarized by the Pennsylvania Supreme Court in *Thompson v. City of Philadelphia,* 507 Pa. 592, 493 A.2d 669 (1985):

"This court has repeatedly emphasized that it is not only a trial court's inherent fundamental and salutary power, but its duty to grant a new trial when it believes the verdict was against the weight of the evidence and resulted in a miscarriage of justice. *Burchard v. Seber,* 417 Pa. 431, 438, 207 A.2d 896, 899 (1965); *Frisina v. Stanley,* 409 Pa. 5, 7, 185 A.2d 580, 581 (1962); *Kiser v. Schlosser,* 389 Pa. 131, 133, 132 A.2d 344, 345 (1957)."

The Supreme Court also detailed the standard in *Mueller v. Brandon* 282 Pa. 37, 422 A.2d 664 (1980):

"[W]here it clearly appears from the uncontradicted evidence that the amount of the verdict bears no reasonable relation to the loss suffered by the plaintiff...." 282 Pa. at 41, 422 A.2d at 665. *Stokan v. Turnbull,* 480 Pa. 71, 75, 389 A.2d 90, 92 (1978).

In the trial of a case, if a defendant is found liable to a plaintiff, the plaintiff is to be awarded full damages. As eloquently stated by the late Justice Musmanno:

"If Mrs. Todd [plaintiff] was entitled to a verdict from the defendant because of injuries he inflicted upon her as a result of his negligence, she was entitled to all that the law provides in such a case. And the items of pain, suffering and inconvenience, as well as loss of wages and earning power, are inevitable concomitants with grave injuries when suffered by a wage-earner. A jury may not eliminate pain from wounds when all human experience proves the existence of pain, and it may not withhold lost wages when the evidence in the case uncontradictedly establishes the loss of wages as a result of the negligence which they, the jury, have adjudicated against the responsible defendant. When it is apparent that a jury by its verdict holds the defendant responsible for a whole loaf of bread, it may not then capriciously cut off a portion of that loaf as it hands it to the plaintiff." *Todd v. Bercini,* 371 Pa. 605, 607-08, 92 A.2d 538, 539 (1952).

At trial, the plaintiff presented undisputed and uncontradicted evidence of the following special, or actual, damages:

(1) Medical expenses totalling $61,004.65.

(2) Funeral expenses totalling $2,969.

(3) Loss of income (Social Security) of $800 per month, or $9,600 per year. Based on a life expectance of 13 years, this would be approximately $125,000.

The jury was invited by the court to reduce that figure "for the lack of maintenance by the plaintiff by the 13 years." (Charge of the court, N.T. 20.)

The evidence as to the special damages does not, of course, take into account the intangible elements

of damages for physical pain and suffering, mental anguish, despair, humiliation, embarrassment, loss of life's pleasures and loss of life, i.e., death. The evidence as to those elements was massive and uncontested.

There are several possible explanations for how the jury arrived at the award of $65,000 to Mr. Behrendt's estate. None of them, however, are acceptable; and each of them demonstrate, at a minimum, that the jury disregarded this court's instructions.

One, the $65,000 could represent an award of all the medical and funeral expenses—$63,973.65—plus a minimal amount for lost income and nothing for pain, suffering, etc.

Or, two, the $65,000 could represent all of the medical and funeral expenses—again, $63,973.65—plus a grand total of $1,026.35 for pain, suffering, etc. and nothing for lost income.

Or, three, the jury may have awarded most or all of the $65,000 for Mr. Behrendt's pain, suffering, etc., and nothing, or nearly nothing, for the medical expenses, funeral expenses and lost income.

Or, four, the $65,000 verdict could represent a combination of part of the medical expenses, part of the funeral expenses, part of the lost income, and a minimal amount for pain, suffering, etc.

There is a fundamental and self-evident flaw in each of the possible explanations: they all represent a disregard for the law which the jurors took an oath to apply. They all also fly in the face of, and bear no reasonable relation, to the loss suffered. And, as a consequence, any and all of the possible explanations demonstrate "an evident failure of justice to the plaintiff." *Id.*

In *Mueller v. Brandon, supra,* the plaintiff suffered a broken left ankle, a concussion and cut on her forehead, and a broken nose. An award of damages for pain and suffering which represented 28 percent of the special damages was held to be inadequate. In *Hill v. Commonwealth, Bureau of Corrections,* 124 Pa. Commw. 172, 555 A.2d 1362 (1989), the plaintiff suffered a broken ankle and a broken leg; an award of damages for pain and suffering which represented 30 percent of the special damages—"a ratio ... far below what is customary in personal injury cases"—was held to be inadequate. 124 Pa. Commw. at 180, 555 A.2d at 1366-67.

And in *Lininger v. Kromer,* 238 Pa. Super. 259, 358 A.2d 89 (1976), the plaintiffs suffered unspecified "serious" injuries. There, awards of damages for pain and suffering which represented approximately 50 percent of the special damages were held to be inadequate. In all of these cases, the plaintiffs incurred what the courts described as serious pain.

All of these plaintiff's injuries pale in comparison to what Mr. Behrendt went through. And here, Mr. Behrendt's estate was awarded—depending on which possible explanation one wishes to accept—either nothing for pain and suffering, or else the equivalent of something on the order of 1 percent, or even less, on the special damages. Under *any* of the possible explanations of the jury's verdict on damages, the award did not even include the full amount of specials.

Accordingly, the damages award simply bore no reasonable relation to the loss suffered, and hence, a new trial should be granted. *Mueller v. Brandon, supra.*

As to the $5,000 verdict for loss of consortium, we feel that this, too, was inadequate.

This court instructed the jury that in weighing the damages for Mrs. Behrendt's loss of consortium, it "should consider the effect which the injury has inflicted upon the marital relationship while he was still alive. The widow's loss of companionship, loss of assistance, services and conjugal fellowship due to her husband's debilitation and suffering and overall destruction of the life of Mrs. Behrendt as a result of her husband's lingering death from mesothelioma. You must remember that the action for loss of consortium is an individual action in her own right to compensate for her loss due to the suffering and demise of her husband." (Charge N.T. 21.)

Considering the evidence of the devastating effect Mr. Behrendt's illness and death had upon Mrs. Behrendt, the jury—in awarding only $5,000—apparently disregarded the law as given by this court.

The evidence in this regard was that throughout her husband's illness Mrs. Behrendt was by his side, night and day. Mrs. Behrendt watched over her husband so thoroughly that she even lay on the floor at night to prevent him from possibly falling down the stairs if he got out of bed. As a result, she was exhausted.

Through the around-the-clock care of her husband, Mrs. Behrendt watched as he slowly and painfully died. Mr. Behrendt was so embarrassed about his deteriorating physical condition that Mrs. Behrendt took the mirror out of his bedroom so he couldn't see himself. But Mrs. Behrendt wasn't so fortunate—she couldn't take away her own eyes; she saw directly what her husband was saved from seeing in the mirror.

His debilitation led to her facing and then making the difficult decision of finally seeing her husband leave their home, never to return, and being placed in a nursing home. On October 9, 1991, when the Behrendts were

supposed to be celebrating their 44th wedding anniversary and enjoying his retirement, Mrs. Behrendt instead was told her husband had died.

When he died, a part of her died too. Instead of looking forward to 13 more years of life with her husband, Mrs. Behrendt was left a widow at age 65. At the time of death, Mrs. Behrendt was shocked, and even at the time of trial she was still a lost person. She had no motivation to do anything, and she had no plans to do anything.

For nine months of suffering along with her husband and for the loss of her husband of 44 years, Mrs. Behrendt was awarded $5,000.

Consortium is a recognized measure of damages in Pennsylvania; and if under the above facts in today's market, it can only amount to $5,000, we might as well do away with it.

There is, of course, another possible explanation—our old friend the compromise verdict, and it is on this concept that defendants take their stand.

At the outset, we reject the plaintiff's contention that compromise verdicts are only considered in cases of contributory negligence or comparative negligence. While these doctrines may have been at issue in the cases cited by the plaintiff, this does not mean that the principle was based exclusively on the particular factual situation involved. Indeed, the decisions are to the contrary in *Deitrick v. Karnes,* 329 Super. 372, 478 A.2d 835 (1984), the decision referred to a liability impasse which, of course, is broader than the negligent concept. *Guidry v. Johns-Manville Corp.,* 377 Pa. Super. 308, 547 A.2d 382 (1988) and *Gross v. Johns-Manville Corp.,* 410 Pa. Super. 486, 600 A.2d 558 (1991), were both asbestos cases involving conflicting evidence on causation in which the Superior

Court upheld the lower awards on the theory of a compromise verdict.

Defendants set forth three issues on which they assert there was conflicting evidence which would justify a compromise verdict. They say evidence was presented that Mr. Behrendt died of thyroid cancer rather than mesothelioma, that they had a "fiber-type defense" in that their products did not have the proper type of fiber in their asbestos to cause mesothelioma, and third, that there was evidence of warnings on the product.

Had there been but a general verdict, and not one based on answers to special interrogatories, defendants might have a point. However, answers to the special interrogatories, in conjunction with the charge of the court, negate their contentions.

As to the diagnosis, Interrogatory no. 1, answered in the affirmative, stated:

"Did plaintiff's decedent, Otto B. Behrendt, have any asbestos-related injury?"

The dichotomy on the type of cancer Mr. Behrendt suffered from was the major issue the jury was asked to decide:

*"The Court:* [O]ne of the key issues of course, is what did the gentlemen die of? Was it mesothelioma as the plaintiff's doctors say, the pathologist, the man who performed the autopsy? Or as Dr. Demopoulos said, was it thyroid cancer? And of course, the key is this. One would come from asbestos products and one from the thyroid would not. So it is a very determinative question. But you have a conflict. And you have to decide which you are going to accept. (Charge, N.T. 708.)

"You will recall there was a divergence of opinion—that is putting it mildly—between Dr. Demopoulos and Drs. Gabrielson and Mihalakis.

"It is your duty as jurors, as judges of the facts, to resolve that divergence of opinion." (Charge. N.T. 10.)

As noted above, the difference of opinion between Drs. Gabrielson and Mihalakis, for the plaintiff, and Dr. Demopoulos, for the defendants, was total. It is uncontradicted that the thyroid cancer could not have developed from exposure to asbestos. Furthermore, we elaborated on Interrogatory no. 1 in our charge to the jury:

"Did plaintiff decedent, Otto Behrendt, have any asbestos-related injury? That really is, does he have mesothelioma which—he died as a result of either mesothelioma or thyroid cancer." (Charge, N.T. 16.)

In answering Interrogatory no. 1 in the affirmative, the jury clearly indicated it had no dispute as to the type of cancer from which Mr. Behrendt suffered and died.

The fiber defense was based on Dr. Demopoulos' testimony that only crocidolite asbestos causes mesothelioma, and the defendants' assertion that none of their products contained crocidolite asbestos. Again, we must look at the special interrogatories. Interrogatory no. 2 was as follows:

"2. As to each of the following defendants, do you find that plaintiff's decedent, Otto E. Behrendt, inhaled asbestos fibers from products of that defendant and that that inhalation of fibers was a substantial contributing factor in bringing about the decedent's asbestos-related injury?

"GAF Corp.                      YES  X   NO ___

"National Gypsum Co.            YES  X   NO ___

"Owens Corning Fiberglas Corp. YES  X   NO ___

"United States Gypsum Co.       YES  X   NO ___"

Subsumed within that question is the issue of the so-called "fiber defense" in that the jury found that the inhalation of the fibers was a substantial contributing factor.

Furthermore, there was evidence in answers to discovery interrogatories that the defendants' products at various times may well have contained crocidolite fibers.

The warning argument is equally specious. Only one defendant, GAF Corporation, presented any evidence that some of its products at one time contained a warning. Yet the jury made no distinction among the defendants and found that the products of each of them were substantial contributing factors.

In our analysis of the testimony, we find no reasonable basis for the jury's compromise on any of the questions pertaining to liability.

The three cases relied on by the defendants are distinguishable. *Deitrick v. Karnes,* 329 Pa. Super. 372, 478 A.2d 835 (1984), was a negligence case where, despite the jury's finding that the plaintiff was 50-percent negligent, the award on damages was held to be inadequate. In both *Guidry v. Johns-Manville Corp.,* 377 Pa. Super. 308, 547 A.2d 382 (1988), and *Gross v. Johns-Manville Corp.,* 410 Super. 486, 600 A.2d 558 (1991), there was evidence of multiple causes for the plaintiff's disease and suffering. In *Guidry,* the plaintiff's own expert testified that both smoking and asbestos exposure contributed to the plaintiff's lung cancer. Accordingly, the court considered it likely that the award on damages had been compromised to account for the competing causes. Similarly, in *Gross* there were multiple explanations for the plaintiff's shortness of breath—obesity, coronary irregularities and/or asbestosis. There the jury could have found that the

plaintiff had asbestosis, but that the cause of his shortness of breath was a combination of asbestos-related and non-asbestos-related factors. Hence, a compromise on damages was accepted.

In contrast to these decisions is the case at bar where the crucial issue was whether the decedent had mesothelioma (caused by asbestos) or thyroid cancer (not caused by asbestos). There was no possibility that he had a cancer caused partially by asbestos and partially by some unknown thyroid condition or partially by smoking. The issue over what type of cancer Mr. Behrendt had was an "all or nothing" mesothelioma vs. thyroid, or day vs. night, or Chevrolet vs. penguin issue. All expert witnesses at trial agreed that: (1) if he had mesothelioma, the only cause of it was asbestos, and (2) if he had thyroid cancer, asbestos played no role in its causation. It was not an issue which lent itself to compromise.

Concluding, as we do, that a new trial is in order, the question remains as to whether it should be both as to liability and damages, or only on the latter. The Pennsylvania Supreme Court has enunciated the standard for granting a new trial limited to damages, as follows:

"The granting of a limited retrial is within the court's discretion when the issue of liability has been determined by the jury in a trial free from error, and the verdict is supported by the evidence." *Stokan v. Turnbull, supra,* 480 Pa. 71, 75, 389 A.2d 90, 93 (1978). The Superior Court has rephrased the standard as follows:

"A lower court may grant a new trial as to damages, only where the issue of liability is not intertwined with questions of damages and the issue of liability is either not contested or has been fairly determined so that no substantial complaint can be made with respect thereto."

*Nardi v. Stayton,* 270 Pa. Super. 267, 269, 411 A.2d 520, 521 (1979). (citations omitted)

Based upon this standard:

"[I]t is proper for the court to limit a new trial to the issue of damages, if a new trial on liability would be a repetition of what had been fairly, completely, and decisively adjudicated against the defendant, thereby making a new trial on liability a wholly empty procedure; this is especially so where neither defendant has asked for a new trial or has suggested that new or additional evidence could be presented on the subject of liability." *10 Standard Pennsylvania Practice 2D,* §62:100, citing *Daugherty v. Erie Railroad Company,* 403 Pa. 334, 169 A.2d 549 (1961).

As stated in *Stokan, supra,* a new trial can be limited to the issue of damages where (1) the issue of liability has been determined by the jury, (2) the trial is free from error, and (3) the verdict on liability is supported by the evidence. 480 Pa. at 71, 389 A.2d at 93. Each of these elements has been met by the plaintiff. The first element—the determination of the liability issue—has been fully discussed above.

The third element—that the verdict on liability is supported by the evidence—is clear. The plaintiff presented two expert pathologists, one who performed the autopsy on Mr. Behrendt and another who spends more than half of his professional time researching the very issue at the trial—cancer and how asbestos causes it, with particular emphasis on mesothelioma. Both opined unequivocally that Mr. Behrendt had, and died of, mesothelioma caused by his exposure to asbestos.

Countering the plaintiff's experts was defense expert Harry Demopoulos, M.D., a pathologist by medical edu-

cation who performs no autopsies, does no research in the field of asbestos-related disease, and is not a member of any professional societies or organizations in the field of pathology. Dr. Demopoulos has, significantly, testified on behalf of asbestos companies approximately 150 times. (Demopoulos N.T. 18-21, 98.) It is beyond peradventure that the verdict against the defendants was supported by the evidence.

Finally, as to the second element of the standard set forth in *Stokan, supra*—that the liability determination was made in a trial free from error. There are no evidentiary issues which could change the evidence as presented at trial. None of the defendants have raised any alleged errors, evidentiary or otherwise, post-trial. Further, it is quite unlikely that any new or additional evidence could be presented on the subject of liability in a new trial. Mr. Behrendt, of course, is deceased. Thus, the physical evidence relating to his cancer—and the type of cancer it is—cannot be changed. It is what it is. As stated by the Supreme Court in *Daugherty v. Erie Railroad Company, supra,* 403 Pa. 334, 169 A.2d 549 553:

"A new trial on liability would be a repetition of what has been fairly, completely and decisively adjudicated against the defendants. A new trial on liability would be a wholly empty procedure. It would be a dress rehearsal of a play which has closed."

Accordingly, we enter the following

## ORDER

And now, July 7, 1993, plaintiffs are awarded a new trial, said trial to be limited to the issue of damages.